**NATIONAL LABOR RELATIONS BOARD**
**v.**
**SHANNON et al.**
**No. 13644.**

United States Court of Appeals,
Ninth Circuit.

Dec. 14, 1953.

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. Gen. Counsel, Owsley Vose, Rose Mary Filipowicz, Washington, D. C., Charles K. Hackler, Los Angeles, Cal., for petitioner.

James S. Duberg, Holmes E. Hobart, Los Angeles, Cal., for respondent.

Before DENMAN, Chief Judge, and POPE, Circuit Judge, and DRIVER, District Judge.

DENMAN, Chief Judge.

This is a petition to enforce an order of the National Labor Relations Board (hereafter the "Board"), pursuant to § 10(e) of the Labor Management Relations Act (hereafter the "Act").

The question presented by this petition is whether the evidence supports the conclusion of the Board that respondent

had refused to bargain with a certified bargaining representative in violation of § 8(a)(5) of the Act.

The findings of operative fact of the Board are all supported by substantial evidence and reveal: Respondent, Shannon and Simpson Casket Company, the employer in this case, is a partnership consisting of Edward Shannon, C. W. Shannon and Arthur F. Simpson. The Upholsterers' International Union of North America, Local #15 (hereafter the "Union") was the duly authorized bargaining representative of the employees of respondent. On February 20, 1950, Harry Smulyan, the Union's business manager, called C. W. Shannon and requested a conference to discuss an agreement. This conference was held on the following day. There was discussion as to the necessity of establishing wage scales for each class of work done in respondent's plant, but the real bone of contention was the insurance plan contained in the Union's proposed contract. That plan required the employer to pay 3% of its payroll towards the premiums, with the employees paying nothing. Shannon indicated that he prefered a plan whereby respondent would pay 2% of its payroll and the employees would pay 1% of their salary towards the premiums.

At a subsequent meeting on February 28, 1950, agreement was reached on wages, but the wording of the contract and the insurance provisions remained to be settled. Smulyan offered to prepare a new Union proposal embodying the changes desired by respondent which the Union found acceptable. On March 15, Shannon and Smulyan met for the third time, and Shannon was presented with a draft agreement supplemented by a wage schedule. The schedule embodied the rates agreed upon by the parties at their previous conference. Shannon refused to sign the draft, however, on the ground that it did not, in its totality, embody the agreements reached by the parties. The insurance clause in particular was objected to by Shannon. This draft agreement was taken by Smulyan before a meeting of the employees who discussed it and approved it. Shannon agreed to take the proposal to his partners, who refused to accept it.

In the first week of April, respondent instituted the wage rates agreed upon by the parties in order to quiet the unrest among the employees resulting from the absence of a contract. Shortly thereafter, Shannon retained James W. Duberg, an attorney, to act as his bargaining representative. On April 19 a conference was held. Shannon introduced Duberg as his attorney and left. Duberg refused to recognize or accept any agreement reached by Smulyan and Shannon in earlier conferences. Duberg did, however, promise to prepare a counter-proposal on behalf of respondent.

A picket line was formed around respondent's plant the following morning and all of the employees left their jobs. Simpson spoke to the workers on the line, including members of the grievance committee, and offered a five-cent an hour wage increase in lieu of the Union's proffered insurance plan. The employees voted to accept the offer and return to work. The increase in wages was to take effect on the signing of the contract.

On April 22, another conference was held. Duberg presented respondent's proposal which contained no wage schedule, Duberg expressing to Smulyan that there was no controversy over wages and that the wage schedule agreed upon could be added later if an agreement was reached. The negotiators discussed each paragraph of the proposal and no disagreement was reached until they came to the paragraph setting forth the grievance procedure. Duberg offered to prepare a more detailed provision in this regard and the conference ended. On April 24 a new conference was held at which the new proposal was put forth. This proposal was substantially the same except that it contained a more detailed grievance procedure and provided for permissive arbitration. Smulyan insisted on automatic instead of permissive

arbitration. Duberg refused to acquiesce and the negotiations foundered on this issue.

On May 1, 1950, a second strike occurred, lasting for three days. On May 2, the parties met before a Commissioner of Conciliation. At the outset of the discussion, Falkenborg, an associate of Duberg, was the only representative of respondent present. Falkenborg was a duly authorized representative of respondent. The parties considered Union proposals derived from its last draft agreement, paragraph by paragraph. Falkenborg initialed some of the sections discussed as acceptable to respondent. Duberg, arriving at the afternoon session of the conference, insisted that the discussion be on the basis of the entire contract rather than on the paragraph by paragraph basis that had been followed in the morning. The conference broke up when Smulyan refused to put the Union proposals in the form of an integrated offer. Thereafter, Duberg acted on the basis that the Union having refused the employer's proposal and not having put in a counter-proposal, there was nothing on the table for the parties to discuss. Smulyan made efforts throughout the summer to get the negotiations under way again, but was refused on the ground that there was no proposal presented by him.

On August 5, 1950, respondent announced a general wage increase of five cents an hour for all employees without previous notice or negotiations with the Union. The wage increase was given for purely economic reasons, to reduce the likelihood of employee turnover in the period of increased business activity and progressive price and wage inflation which followed the outbreak of the Korean War. The wage increase was discussed with the employees in the shop, the shop steward of the Union being present.

On September 18, 1950, the parties met before a Commissioner of Conciliation at the Union's request. Smulyan insisted that an agreement had already been reached and Duberg insisted that there was nothing on the table to discuss. Duberg suggested that a new wage schedule should be agreed upon to take into account the changes occurring since the outbreak of the Korean War.

On October 5, 1950, another conference was held. Duberg rejected the Union's proposal in its entirety and submitted a counter-proposal, including a supplementary insurance program to be entirely financed by the employer. Smulyan expressed disapproval of the plan. Duberg indicated that the proposal was a final offer and that it should be put to a vote of the employees. This was done and the plan was rejected by one vote. After the night shift had been polled, Smulyan called Shannon to advise him that the employees had authorized him to accept respondent's proposal without the insurance program. Neither party was willing to accept the other's insurance plan. Duberg then wrote to Smulyan that in view of the latter's rejection of respondent's counter-proposal of October 5, there was nothing on the table to be accepted. A strike followed which is still current.

On the basis of the above facts, the trial examiner found that respondent was guilty of refusing to bargain with a certified bargaining representative, Act, § 8(a) (5), in the following particulars: (1) By Duberg's refusal to recognize the paragraphs of the draft agreement to which Falkenborg had indicated acquiescence on the part of respondent; (2) respondent's unilateral wage increase given on the 5th of August was in derogation of the Union's right to recognition as the exclusive bargaining representative of the employees; (3) the refusal in October to consider any but an in toto acceptance of respondent's counter-proposal.

The order of the Board requires respondent to cease and desist (1) from refusing to bargain collectively with the employer; (2) from taking unilateral action in derogation of the Union's right to act as the exclusive bargaining agent of the employees; and (3) from interfering in any manner with the efforts

of the Union to bargain collectively. Affirmatively, respondent is required to bargain collectively with the Union upon request and to post the customary notices.

■ Once a union has been duly certified as the statutory bargaining representative of a unit of employees, the employer is under a duty to enter into sincere, good faith negotiations with that union, with an intent to settle the differences and to arrive at an agreement. N. L. R. B. v. Montgomery Ward & Co., 9 Cir., 133 F.2d 676, 686, 146 A.L.R. 1045; N. L. R. B. v. Biles Coleman Lumber Co., 9 Cir., 98 F.2d 18, 22. Mere pretense at negotiation "with a completely closed mind and without this spirit of cooperation and good faith is not a fulfillment of this duty." N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, 885, certiorari denied, 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549; see also, N. L. R. B. v. American Nat. Ins. Co., 343 U.S. 395, 402, 72 S.Ct. 824, 96 L.Ed. 1027.

■ At the May 2 meeting, respondent's bad faith in negotiating first became apparent when Duberg refused to recognize the paragraphs of the draft agreement to which Falkenborg had acquiesced on behalf of respondent. This conduct had the effect of widening rather than narrowing the area of disagreement between the parties and is evidence of bad faith on behalf of the employer. N. L. R. B. v. Tower Hosiery Mills, 4 Cir., 180 F.2d 701, 705, certiorari denied, 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596; N. L. R. B. v. Union Mfg. Co., 5 Cir., 179 F.2d 511.

■ The Board also found that respondent had committed a violation of § 8(a) (5) when it gave a unilateral wage increase to its employees without notice to the Union. The Board's theory is that the effect of such a wage increase, even though justified by sound economic and business reasons, is to weaken the union's position as the employees' chosen bargaining representative. A unilateral wage increase, following other acts evidencing a refusal to bargain in good faith, may properly be viewed as a furtherance of the bad faith towards the bargaining reprsentative. N. L. R. B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, 135–136, certiorari denied, 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503. "Employer action to bring about changes in wage scales without consultation and negotiation with the certified representative of 'its employees cannot, we think, logically or realistically, be distinguished from bargaining with individuals or minorities." May Department Stores Co. v. N. L. R. B., 326 U.S. 376, 384, 66 S.Ct. 203, 208, 90 L.Ed. 145.

■ After the October 5 meeting, Smulyan reported to Duberg and to Shannon that the men would accept the contract proposed by respondent without the insurance provision. Duberg rejected any acceptance other than one of the entire proposal. This the Board found to be a further violation of § 8(a) (5). This action by Duberg threw the entire negotiations into the air and left no area of agreement. As was stated in N. L. R. B. v. Tower Hosiery Mills, supra, 180 F.2d at page 705: "Respondent's unilateral action, its insistence upon the harsh provisions of Article IX, its refusal to enter into an agreement with respect to matters no longer at issue, and the long and fruitless negotiations viewed in the light of the Union's many concessions, justify the conclusion that the respondent acted in bad faith."

The order of the Board is ordered enforced.