### NATIONAL LABOR RELATIONS BOARD
v.
### NESEN.
No. 13204.

United States Court of Appeals
Ninth Circuit.
Feb. 26, 1954.

---

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Julius G. Serot, Atty., N.L.R.B., Washington, D. C., for petitioner.

Potruch, Fredricks & Lerten, Erwin Lerten, Los Angeles, Cal., for respondent.

Before DENMAN, Chief Judge, and HEALY and BONE, Circuit Judges.

DENMAN, Chief Judge.

The National Labor Relations Board (hereafter the Board) petitions for an adjudication that respondent, R. D. Nesen, is in civil contempt of this court for having failed and refused to obey the decree of this court entered on January 23, 1952.

After hearing had been duly held, the Board entered findings that respondent had refused to bargain collectively with the International Association of Machinists, Local Lodge No. 1831 (hereafter the Union). The Board petitioned this court for enforcement of its order and on January 23, 1952, an order of enforcement was entered on the consent of respondent. On August 25, 1953, the Board filed this petition, alleging that respondent still refused to bargain with the Union. By stipulation of the parties, the matter was referred to a special master, Reuben G. Hunt, for hearings and for proposed findings of fact. Hearings were held before the Special Master on October 13, 15, 16, 17, 18 and 19, 1953, and the Special Master's Report was filed on December 16, 1953. His "Final Recommended Finding of Fact" reads:

"By reason of the foregoing recommended findings of fact, the Special Master makes the further rec-

ommended finding of fact that since the entry of said decree of this court on January 23, 1952, respondent has failed, and is failing, to bargain collectively with the International Association of Machinists, Local Lodge No. 1831, within the meaning of the said decree."

We have for decision: (1) whether the proposed findings of the Special Master should be adopted by this court; and (2) if adopted, the form of the contempt decree.

(A) *The Special Master's Report:* The proposed findings of fact submitted by the Special Master reveal the following:

Respondent, an individual, operates an automobile dealership and automobile repair shop in Oxnard, California. Prior to the entry of the decree of this court, on October 24, 1951, he appointed the Tri-County Employers' Association as his bargaining agent. No cancellation of this appointment was made prior to August 25, 1953, when this petition was filed. Thomas B. Flynn was manager of the Association and acted on its behalf in representing respondent.

On February 8, 1952, the Union sent a letter to respondent in which it requested a meeting. Flynn suggested a meeting between him and Hemme (the Union representative), but the latter objected to proceeding without the presence of respondent.[1] On March 12, 1952. the first meeting between the parties was held, with inconclusive results. On April 9, 1952, a second meeting was held. At both these meetings, respondent was present and Flynn stated that he was representing respondent and had the authority to act for him. Respondent did not deny Flynn's authority at either meeting. At the meeting of April 9, the parties reached an agreement on all terms of the proposed contract with the exception of wage rates and the union security clauses.[2]

During the period from April 9 to June 9, 1952, several inconclusive conferences were held. At a meeting on the latter date, Flynn stated that he would suggest that respondent accept the modified union security clause, that he had no authority to go further. On July 8, the Union requested that respondent send it a counter-proposal embodying the terms already agreed upon, and on July 26, Flynn sent such a document to the Union on behalf of respondent. This document contained respondent's offer of a $1.65 per hour minimum wage and a modified union shop plan.

On August 15, the Union sent Flynn a proposed contract signed by it with a request that Flynn have respondent sign it. This document differed from the document sent the Union by Flynn in the following particulars: (1) it contained an effective date of August 15, 1952, where the Flynn document was blank; (2) it provided dates during which union members might resign in the future as from August 1 to August 15 of each succeeding year, where the Flynn document was blank; (3) it contained an antidiscrimination clause (couched in the language of Section 8(a) (3) of the Act), which the Flynn document did not; and (4) it provided for paid holidays, which the Flynn document did not; and (5) it provided that employees should be paid 50% of the established hourly customer charge while the Flynn document provided they should be paid 50% of the customer labor charge where such charge was based upon a flat rate to the customer (so-called "discount work"). Changes (3), (4) and (5) were made upon a statement by Randall, a state labor conciliator, to the Union that he had consulted with respondent concerning them and that they were acceptable to respondent.[3] Later Flynn

---

1. This was in accordance with established Union policy that the first bargaining session be with the employer and not with his representative.

2. This was admitted by respondent's answer to the petition for an adjudication of civil contempt.

3. There is nothing in the Special Master's report showing that Randall had any authority to make such a statement on respondent's behalf.

discussed the Union proposal with respondent. The latter objected to the provisions for (1) paid holidays; (2) overtime pay; (3) shift differentials; (4) rate of pay on discount work; and (5) the maintenance of membership clause. The overtime pay, shift differential, and maintenance of membership clauses were identical with those contained in the Flynn document of July 26. Neither Flynn nor respondent notified the Union of these objections, nor did respondent ever notify the Union that Flynn's proposal of July 26 was not authorized by him.

On September 8, Martin Zimring, field examiner for the Board, wrote Flynn and inquired as to the status of negotiations. Flynn answered on September 19, informing Zimring that the contract had been signed and that he would send copies of the contract to the Board. This was never done, indeed it could not be done since the contract had never been signed. Flynn did not reply to further inquiries by Zimring until November 12, when, after respondent had been threatened with further legal action, Flynn wrote Zimring that he had only meant that the contract was "set" to be signed after a few "kinks" had been worked out. In the meantime, the Union wrote to Flynn on October 14, 1952, sending a copy of the letter to respondent stating that it had been informed by Zimring that the contract had been signed and requested the return of three signed copies. Neither Flynn nor respondent ever acknowledged this letter.

However, on November 4, Flynn did write the Union that the contract submitted by it was acceptable to respondent except in the following particulars: (1) respondent would pay a minimum wage of no more than $1.55 per hour (the Flynn July 26 proposal contained a minimum wage of $1.65 per hour); (2) respondent would not consent to premium pay for overtime (the Flynn July 26 proposal contained such a provision); (3) the seniority clause would have to be rewritten for purposes of clarity (the language in the Union proposal was the same as in the Flynn July 26 proposal); and (4) the maintenance of membership clause would have to be eliminated (this clause, too, was in the language of the Flynn July 26 proposal with the exception of an added sentence on non-discrimination couched in the language of Section 8(a) (3) of the Act), 29 U.S.C.A. § 151 et seq. No mention was made in this letter of the sick leave or shift differential provisions contained in the Union proposal.

Respondent himself forwarded a new contract proposal to the Union on November 7, which contained, in addition to the terms in Flynn's letter of November 4, the following changes: (1) elimination of shift differentials and (2) elimination of sick leave provisions (both of which were contained in the Flynn July 26 proposal). Following this submission of respondent's proposed contract, there was an exchange of letters relative to the holding of a meeting in which the Union claimed that Flynn, acting on behalf of respondent, had concluded an agreement. Respondent claimed for the first time that Flynn's authority was only to bargain, that only he, respondent, had the final say. The parties finally agreed to hold a meeting on January 15, 1953.

At this meeting, the respondent suggested a discussion of his contract proposal of November 7, 1952. Hemme refused to discuss this proposed contract or any provisions thereof on the ground that there was already an agreement between respondent and the Union and that no useful purpose could be served by further negotiations. Respondent filed charges that the Union had refused to bargain, but the General Counsel for the Board refused to issue a complaint upon these charges. No further negotiations have been attempted.

(B) *Objections to the Special Master's Report:*

Respondent's objections to the proposed findings of fact, with but one

unimportant exception,[4] are based upon a view of conflicting evidence different from that of the Special Master and are rejected. See N. L. R. B. v. Remington Rand, Inc., 2 Cir., 130 F.2d 919, 925–926.

The proposed findings of fact of the Special Master, as modified (see footnote 4, supra), are adopted as findings of this court.

(C) *The Violation of the Decree:*

The order of this court which the Board alleges respondent has violated reads as follows, insofar as here applicable:

"Respondent, his officers, agents, successors and assigns shall:

"(1) Cease and desist from:

"(a) Refusing to bargain collectively with the International Association of Machinists, Local Lodge # 1831, hereinafter referred to as the Union, or its representatives, as the exclusive representative of all of his employees in the appropriate unit;

\* \* \* \* \*

"(2) Take the following affirmative action in order to effectuate the policies of the National Labor Relations Act:

"(a) Upon request bargain collectively with the International Association of Machinists, Local Lodge # 1831, as the exclusive representative of all its employees in the appropriate unit.

\* \* \* \* \* "

█ The Special Master, in his final recommended finding of fact, concluded that respondent had failed and is failing to bargain collectively with the Union within the meaning of the decree. The facts support this conclusion.

█ On April 9, 1952, the parties had agreed on all terms of a contract with the exceptions of wage rates and union security. Yet thereafter respondent made new demands concerning matters already agreed upon.[5] Also, respondent failed to recognize agreements reached by his bargaining representative after leading the Union to believe that the bargaining representative had full authority to conclude an agreement.[6] Further evidence of respondent's bad faith is shown in his actions in misleading the Board's representatives and in his failure to acknowledge communications from the Board and the Union. This evidence shows that respondent did no more than make a mere pretense at negotiating, keeping a completely closed mind and having no spirit of cooperation and faith. Such action is not the good faith bargaining which the Act requires. N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, 885, certiorari denied 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549; see also, N. L. R. B. v. American Nat. Ins. Co., 343 U.S. 395, 402, 72 S.Ct. 824, 96 L.Ed. 1027; N. L. R. B. v. Shannon, supra, 9 Cir., 208 F.2d 545.

█ The evidence also shows that respondent, through his bargaining agent, had stated to the Board's field examiner that the contract was signed. The Board transmitted this information to the Union, and the Union wrote the re-

---

4. The one exception is the objection to that portion of proposed finding No. IV which reads:

"\* \* \* At the meeting of April 9, 1952, the Union, through Edward Skagen, submitted a modified union security proposal, providing that all employees of the company who are presently members of the Union must remain such as a condition of continued employment, and all new employees may become members of the Union within thirty days after they are hired, if they so desire. \* \* \*"

The proposal in fact read:

"All present employees of the company who are members of the Union thirty (30) days after the signing of this agreement shall remain members of the Union as a condition of continued employment. All employees who subsequently become members of the Union shall remain members for the duration of this agreement."

5. See N. L. R. B. v. Tower Hosiery Mills, 4 Cir., 180 F.2d 701, 705, certiorari denied 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596.

6. See N. L. R. B. v. Shannon, 9 Cir., 208 F.2d 545.

spondent concerning it. No answer to this letter was made. Taking all of the evidence into consideration, we hold that an agreement had been reached according to the terms of the August 15, 1952, Union proposal.

The respondent is adjudged in contempt of court.

(D) *The Remedy.*

■ This court should impose whatever sanctions are necessary under the circumstances to grant full remedial relief, to coerce the contemnor into compliance with this court's orders, and to fully compensate the complainant for losses sustained.[7]

■ Accordingly, we direct the respondent to purge himself of the civil contempt by taking the following steps:

(1) Within thirty (30) days of the entry of the order in accordance with this opinion, sign five copies of the proposed contract submitted by the Union on August 15, 1952;[8] and

(2) Within ten days after such copies of this contract have been signed, deliver three signed copies thereof to the Union, one signed copy thereof to the Director of the Twenty-first Region of the Board, and one signed copy thereof to the clerk of this court; and

(3) Immediately post in conspicuous places at his premises, including all places where notices to employees customarily are posted, for a period of sixty (60) consecutive days, copies of the following:

(a) The decree of this court entered on January 23, 1952; and

(b) The order to be entered in accordance with this opinion; and

(c) An appropriate notice signed by respondent stating that respondent has been adjudged in contempt of court for failing to comply with the decree of this court entered on January 23, 1952, and that he will take the action in purgation ordered by this court; and

(4) Pay to the Board, as costs of court, an amount adequate to compensate the Board for its costs and expenses, including salaries, in investigating, preparing, and presenting the matters involved in these contempt proceedings, the amount to be determined upon proof submitted by the Board when these proceedings are finally concluded;[9] and

(5) Immediately pay to the clerk of this court, as additional costs of court, the sum of Nine Hundred Seventeen Dollars ($917.00), the amount of the reporter's fees for the hearing before the Special Master and for the preparation of the transcript;[10] and

(6) File a sworn statement with the clerk of this court and a copy thereof with the Director of the Twenty-first Region of the Board, within forty (40) days after the entry of the order in accordance with this opinion, showing what steps have been taken by respondent to comply with the court's directions. Upon the failure of respondent to make a satisfactory showing, this court will deal further with the matter by imposing upon respondent a compliance fine of Five Hundred Dollars ($500.00) and a further compliance fine of One Hundred Dollars ($100.00) per day for each day of continued non-compliance and by such other means as the court may direct.

The clerk will enter an order in accordance with the above opinion and direction.

---

7. See McComb v. Jacksonville Paper Co., 336 U.S. 187, 191–193, 69 S.Ct. 497, 93 L.Ed. 599; United States v. United Mine Workers, 330 U.S. 258, 303, 67 S.Ct. 677, 91 L.Ed. 884.

8. See H. J. Heinze Co. v. N. L. R. B., 311 U.S. 514, 526, 61 S.Ct. 320, 85 L.Ed. 309.

9. See West Texas Utilities Co., Inc. v. N. L. R. B., D.C.Cir., 206 F.2d 442, 448.

10. The clerk is directed, upon receipt of this amount, to pay it over to the reporter, Helen G. Schulke, 343 Federal Building, Los Angeles 12, California.