NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

STANISLAUS IMPLEMENT AND
HARDWARE COMPANY, Ltd.,
Respondent.

No. 14358.

United States Court of Appeals
Ninth Circuit.

Oct. 12, 1955.

George J. Bott, Gen. Counsel, David
P. Findling, Associate Gen. Counsel,
Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Jean Engstrom,
Attys., N. L. R. B., Washington, D. C.,
George O'Brien, Atty., N. L. R. B., Los
Angeles, Cal., for petitioner.

David E. Lombardi, Richard Ernst,
San Francisco, Cal., for respondent.

Before HEALY and FEE, Circuit Judges, and JAMES M. CARTER, District Judge.

JAMES M. CARTER, District Judge.

This is a petition to enforce an order of the National Labor Relations Board pursuant to Section 10(e), 29 U.S.C.A. § 160(e), of the National Labor Relations Act as amended, 1947, 29 U.S.C.A. § 151 et seq.

The questions presented are: (1) whether the standards set up by the Board in June 1954, pertain to a petition for enforcement before this court of a Board order made on November 19, 1952, and (2) whether the evidence supports the conclusion of the Board that Respondent refused to bargain in good faith with the representative of the employees in violation of Section 8(a) (5) and (1) of the Act. 29 U.S.C.A. 158(a) (5) and (1).·

The respondent, Stanislaus Implement and Hardware Company, Ltd., hereinafter called the "Company," seeks disposal of this case without a consideration of the merits on the ground that the current standards set by the Board preclude the exercise of jurisdiction over this respondent.

The charge against the employer was first filed April 30, 1951, thereafter amended, and a complaint was issued on December 27, 1951; thereafter hearing was held, an intermediate report was made, a recommended order proposed and the Board rendered, on November 12, 1952, its order here sought to be enforced.[1] (Reported 101 N.L.R.B. 394).

█ The complaint alleges, and the answer admits that the Company handled merchandise valued at more than $450,000, manufactured outside California but shipped to the Company from manufacturers' distribution points within California, and that the Company annually sold for direct shipment to points outside of California, merchandise valued at more than $25,000. These allegations brought the complaint within the standards set by the Board in 1950 for the exercise of its jurisdiction and in effect until 1954.[2]

On October 26, 1954, the Board in Jonesboro Grain Drying Cooperative, 110 N.L.R.B. (No. 67) 481, 35 L.R.R.M. 1038, set forth standards by which the Board would assert jurisdiction over enterprises only if annual interstate shipments exceeded $50,000 or annual indirect in-flow of interstate merchandise exceeded $1,000,000.[3]

The Board thereafter clarified any doubt arising from the new standards, as to their application to pending cases. In Edwin D. Wemyss [Nov. 1954] 110 N.L.R.B. (No. 134) 840, 843, 35 L.R.R.M. 1131, the Board stated:

"The present Board had no thought, indeed no basis, for overruling prior Board decisions correctly made under jurisdictional criteria in effect at the time of determination."

"Accordingly it was, and is, Board policy for the future, to proceed as follows: The Board will apply the recently announced jurisdictional standards *to all future* and *to all pending complaint cases* which have not yet resulted in the issuance of a decision and order either finding unfair labor practices or dismissing the complaint. *As to all other complaint cases in which a decision and order has already issued,* the Board will proceed with compliance, enforcement and contempt proceedings, depending upon the status of the cases, without regard to whether the particular case meets the re-

---

1. That portion of the Board's order 2(a) directing that the Company re-employ one, Sims and make him whole, is not before us for enforcement. The order has heretofore been complied with.

2. These standards and the N.L.R.B. applying them are reviewed in Jonesboro Grain Drying Cooperative, 110 N.L.R.B. (No. 67) p. 481-2-3.

3. Apparently the Board had previously announced or published these new standards. See N. L. R. B. v. National Gas Co., 8 Cir.1954, 215 F.2d 160, 162, note 1.

vised jurisdictional standards." [Emphasis supplied.]

The Board then sets forth its reasons in detail, including, "It also seems to us that any other policy would tend to encourage a disregard for law * * * "But once a final determination has been made by the Board after hearing under Section 10(c) that illegal conduct occurred, a proper respect for the operation of law and of the decisions of quasi-judicial agencies seems to us to require that those Board decisions and orders be honored by compliance or enforced whenever necessary."

N.L.R.B. v. National Gas Co., 8 Cir., 1954, 215 F.2d 160, relied on by the Company, was decided in August 1954, before the Wemyss decision, supra, by the Board. At page 163 the court stated, "* * * the Board, under its decision that its new regulations shall apply to pending as well as future cases, has specifically denied its jurisdiction over respondent and other employers similarly situated. It could not consistently with the rules it has adopted and published exert its powers to effectuate an enforcement order of this court against the respondent."

To the extent that the National Gas Co. case relied upon the supposed intention of the Board, the Wemyss case, supra, tells us explicitly the Board's intention and removes that basis for the case. The case is distinguishable in that the Board in Brooks Wood Products, 107 N.L.R.B. No. 71 said its decision in National Gas which the Eighth Circuit refused to enforce, represented an "unwarranted extension" of previously announced standards. Nor had Brooks v. N.L.R.B., 1954, 348 U.S. 96, 75 S.Ct. 176 been decided at the time of the National Gas decision in the Circuit. In Brooks the court in note 16, citing Wilson-Oldsmobile, 110 N.L.R.B. No. 74, referred to the "new jurisdictional yardstick which would place this case if now brought, outside them."

In N.L.R.B. v. Red Rock Co., 5 Cir. 1951, 187 F.2d 76, 78, certiorari denied 341 U.S. 950, 71 S.Ct. 1017, 95 L.Ed. 1373, in answer to a similar contention, the court said, "The fact that by a self-denying rule or order made since this complaint was filed and order entered, the Board has set limits to the exercise in the future of the jurisdiction it possesses is not a matter of which respondent may avail." In N.L.R.B. v. Armco Drainage & Metal Products Inc., 6 Cir., 1955, 220 F.2d 573, at page 584, the court said,

"* * * a change in the policy of the Board does not require its application to the disposition of cases theretofore decided by it and cannot be availed of by a respondent against whom an order has been entered prior to the adoption of such policy."

We conclude the policy of the Board that its 1954 standards do not apply to cases in which it had theretofore made an order, is sound and should not be disturbed.[4]

The Company, by order of a panel of this court, has been allowed to amend its answer to raise the question we have been discussing. It has filed an affidavit here, in support thereof and has moved this court to adduce additional evidence if we consider the affidavit inappropriate. Based on what we have said, the motion to adduce additional evidence is denied, and we hold that the petition of enforcement is properly before the court.

▇▇ Turning to the merits of the case; the court found that during and after January 1951 the Company violated section 8(a) (5) and (1), 29 U.S.C.A. § 158(a) (5) and (1), of the Act by refusing to bargain in good faith with the International Association of Machinists, District Lodge No. 41, hereinafter called the Union; that the employer "approached the bargaining table, not with a sincere desire to resolve its differences with the Union, but with a

4. See, Comment 7 Sanford Law Review 544 issued after decision filed in this case, in accord.

purpose merely of engaging in protracted and meaningless surface bargaining."

An unpretending, sincere intention and effort to arrive at an agreement is required by statute; the absence thereof constitutes an unfair labor practice. N.L.R.B. v. National Shoes, 2 Cir., 1953, 208 F.2d 688; N.L.R.B. v. Shannon, 9 Cir.1953, 208 F.2d 545; N. L. R. B. v. Nesen, 9 Cir. 1954, 211 F.2d 559.

"Good faith" is a state of mind which can be resolved only through an application of the facts in each particular case. N. L. R. B. v. American National Insurance Co., 1952, 343 U.S. 395, 410, 72 S.Ct. 824, 96 L.Ed. 1027.

The facts in essence are as follows: The parties first met, for negotiations, on January 3, 1951, at which time the Union submitted a proposed agreement. Agreement as to any individual clause was to be tentative, to be effective only upon the execution of the entire agreement and subject to final approval by a vote of the Union membership. The parties met several times in January and February 1951, and tentative agreement was reached on most issues. No accord was reached on Union security.

The Company initially objected to the embodiment of a union shop clause in the agreement stating that such would constitute a propaganda weapon in the hands of the Union, useful in an authorization election. The Union suggested in the alternative that the Company record its approval in the form of a letter. To this there was "no serious objection" according to Union testimony which the trial examiner chose to believe. The Company representative, however, testified that the letter was objectionable for the same reason as was the actual clause. Such a letter was never received. At the meeting of February 5th, the Company spokesman informed the Union that it was illegal to discuss union security prior to an authorization election.

The Union, thereafter, asked for and received a letter from the Company consenting to a vote by the employees as to whether they would authorize the Union to enter into an agreement with a union security clause, and negotiations were deferred until such time as the vote could be had. The vote was taken on March 23, and the union approved the security clause.

On April 13, 1951, after a majority of the employees had voted to accept a Union security clause, the Company informed the Union representative that it would not sign "any contract" that provided for a Union shop. Thereafter the Union went out on strike. In March, about a week before the Union election, the employer called together the employees and announced a 10% wage increase contingent upon approval by the War Stabilization Board. The employer had at no time conferred with the Union on this matter, although the president had spoken to a Mr. Larkin about it. The president testified that he believed Mr. Larkin to be an official of the Union. Mr. Larkin in fact held no official position with the Union.

During the summer of 1951, while the strike was still in progress, the Union wrote the Company expressing a desire to resume negotiations, and requesting certain wage data. Meetings were not arranged and the Union did not receive the data requested. Meetings between the parties were later arranged to be held in November 1951. The Company failed to appear at the pre-arranged meetings. Finally, one Baxter, a representative of the California Association of Employers, but acting for the Company, stated to the Union representative, "We are going to stall you for a year and have a decertification election." It is upon this background of facts that the Board's conclusion and order is predicated.

The Company argues that the concessions made and agreements reached "affirmatively show a desire and ability to reach agreement," and that the Company's position on union security was an "orderly development of position in the course of negotiations of a first collective bargaining contract."

True as it may be that the negotiations when viewed in isolation reflect a mind open to agreement, a truer picture is seen by bringing into the open the events which followed the meetings, and by viewing the entire proceeding. A state of mind such as good faith is not determined by a consideration of events viewed separately. The picture is created by a consideration of all the facts viewed as an integrated whole. See N. L. R. B. v. National Shoes, supra, 208 F.2d at page 692; N. L. R. B. v. Reed & Prince Mfg. Co., 5 Cir., 1953, 205 F.2d 131.

The Company's shifting position, its refusal to bargain on a Union security proposal, see N.L.R.B. v. Bradley Washfountain Co., 7 Cir., 1951, 192 F.2d 144, 154; N.L.R.B. v. Andrew Jergens Co., 9 Cir., 1949, 175 F.2d 130, 134; the unilateral wage boost, see N. L. R. B. v. Shannon, supra, 208 F.2d at page 548 and cases there cited; the failure to resume negotiations; the failure or refusal to furnish pertinent wage data, see N.L.R.B. v. Yawman & Erbe Mfg. Co., 2 Cir., 1951, 187 F.2d 947, 949, N.L.R.B. v. Leland Gifford Co., 1 Cir., 1952, 200 F.2d 620, 624; or appear at the scheduled meetings in November during the strike, see N.L.R.B. v. Biles Coleman Lumber Co., 9 Cir., 1938, 98 F. 2d 18, 22; N.L.R.B. v. Pecheur Lozenge Co., 2 Cir., 1953, 209 F.2d 393, 403; certiorari denied 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1099, and finally Baxter's statement characterizing the purpose of the Company, are all facts shedding light on the Company's intent and support the inference drawn by the Board that Respondent did not bargain in good faith.

This court does not sit to parrot the Board's conclusions; but neither does it sit to judge the credibility of witnesses; Precision Fabricators v. N. L. R. B., 2 Cir., 1953, 204 F.2d 567; N. L. R. B. v. San Diego Gas & Electric Co., 9 Cir., 1953, 205 F.2d 471, 475, or dispute the Board's choice between two fairly conflicting views, although this court might justifiably make a different choice were the matter before it de novo.

Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Howell Chevrolet Co., 9 Cir., 1953, 204 F.2d 79, 85.

The testimony upon which the Board and trial examiner placed reliance was not inherently improbable nor the evidence introduced by Respondent so overwhelming as to render that testimony untrustworthy; the evidence in the record as a whole lends itself to two fairly conflicting inferences. The court therefore, recognizing the function of the Board as the trier of fact, will not disturb its findings. The petition for the enforcement of the Board's order is granted.