**LOZANO ENTERPRISES, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 18856.

United States Court of Appeals Ninth Circuit.

Feb. 14, 1964.

Rehearing Denied March 24, 1964.

Sheppard, Mullin, Richter & Hampton, by Frank Simpson III, and Don T. Hibner, Jr., Los Angeles, Cal., for petitioner.

Arnold Ordman, General Counsel; Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Melvin J. Welles, and Peter M. Giesey, Attys., NLRB, Washington, D. C.

Before BARNES, HAMLEY and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Petition to review an order of the National Labor Relations Board which held that the petitioning employer has violated section 8(a) (1) and (5) of the Labor-Management Relations Act as amended. (29 U.S.C. § 158(a) (1, 5)).[1] The order is reported at 143 NLRB 129. The Board has requested enforcement of its order. We conclude that the petition to set aside the order should be denied and that the order should be enforced.

Lozano Enterprises, the employer, is a corporation engaged in the publication, in Los Angeles, California, of "La Opinion", a daily Spanish language newspaper. On December 15, 1961, pursuant to a Board election, the union, Los Angeles Typographical Union No. 174, was certified as the exclusive bargaining representative of the employer's employees in the composing room, press room and stereotype room. Shortly thereafter there began a series of some 25 bargaining sessions, the last of which occurred on Oc-

---

[1] "(a) It shall be an unfair labor practice for an employer—"

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title." Section 7 of the Act (29 U.S.C. § 157) guarantees the right to organize and bargain collectively.

tober 19, 1962. At these sessions the union was represented by one Hardin and the employer by its publisher and president, Lozano, and by Fenton, a labor consultant, who acted as a negotiator. Fenton had authority to recommend the adoption or rejection of various proposals, but final authority to make a contract resided in Lozano, not in Fenton. This the union knew.

■ On September 28, 1962, Lozano being present, the parties reached a tentative agreement, which was to be submitted to the international union for approval. The International returned the contract to the union with certain suggestions for revisions. On October 19, Hardin for the union, and Fenton, together with one Bravo, business manager of the employer, met to discuss changes in the agreement suggested by the International. Lozano was away.[2] The changes suggested by the International were discussed, some were embodied in the agreement, others were modified, and it was agreed that Hardin would put the proposed contract in a final form for review. Hardin also told Fenton and Bravo that he would submit the agreement to the union and advise them as to what action was taken by it. On October 30 Hardin sent such final form of agreement, signed by himself and Marsh, the union secretary, to Fenton, requesting that it be executed by the company and returned for final signature by the president of the International. Fenton received it on October 31 and sent it to Lozano. The latter returned it to Fenton, signed by himself and Bravo, on November 15, with instructions that Fenton could deliver it to Hardin in the

event of a threatened shutdown by the union. He was empowered to use the contract in accordance with his own good judgment, if he felt that there were a real threat of a shutdown.

In the middle of November, not having heard from the employer, Hardin called Fenton to inquire why the signed contract had not been returned. Fenton said that Lozano was out of town, but would sign the contract on his return. Again, in early December, Hardin called Fenton and was told that Lozano's mother was visiting Los Angeles, had torn up the contract, and had relieved Lozano of his position in the company. Fenton then assured Hardin that if he would be patient, Fenton would get the contract signed and forward it to him. At no time did Fenton indicate to Hardin that any provision of the contract was not acceptable. Fenton did not communicate further with the union and on December 26, 1962, eleven days after the end of the year during which, following the December 15, 1961 certification, no further representation election could be held, the employer filed a petition with the Board for an election. It refused to bargain further with the union, claiming that it did not know whether the union still represented its employees.

The specific charge contained in the complaint before the Board in the case before us is set forth in paragraph 8 and reads as follows:

"8. Respondent has refused, and continues to refuse, to bargain collectively in good faith with the Union as the exclusive collective-bargaining representative of all

2. Hardin testified that Lozano, rather than Bravo, was present at this meeting. As to this, his recollection was clearly wrong, and the trial examiner so found. The employer seeks, on the basis of this and certain other errors in recollection, to discredit Hardin's testimony in its entirety. The trial examiner and the Board, however, credited most of Hardin's testimony, and we cannot say that they were not entitled to do so. The rule that a witness may be totally disbelieved if he is found to have testified falsely in any re-

spect is not a command. Witnesses are frequently demonstrably in error in parts of their testimony, but nevertheless believed by the trier of fact in other respects. It is just such judgments that the trier of fact must make. The record certainly does not demonstrate that Hardin was a liar. It is not so unusual as counsel say it is for a person to be very positive—and honestly positive—about an event as to which other evidence shows that he cannot be right.

employees in the unit described in paragraph 5 above in that:

"(a) On or about October 19, 1962, Respondent and the Union agreed upon all the terms of a collective-bargaining agreement and sometime during the month of November, 1962, and again between December 1, 1962, and December 15, 1962, and at all times thereafter, Respondent failed and refused to sign the above agreement as reduced to writing, though requested to do so by the Union.

"(b) On or about December 26, 1962, Respondent filed with the Board a petition for an election among the employees in the unit described in paragraph 5 above for the sole purposes of unnecessarily obstructing negotiations and of avoiding its legal obligation to sign the agreement as reduced to writing described in part (a) of this paragraph."

The trial examiner and the Board, which adopted his findings, found that these charges were sustained. The Board found that the employer and the union had reached agreement, that the employer was under an obligation to so inform the union, that its failure to do so and to deliver the signed agreement was in effect a refusal to sign and therefore a violation of section 8(a) (5). The Board's order directs that the employer cease and desist from the unfair labor practice found, execute the final draft of the agreement submitted to it by the union on or about October 30, 1962, and in all other respects, upon request, bargain collectively with the union. The order contains the customary requirement regarding the posting of appropriate notices.

The employer asserts that the finding that it entered into an agreement with the union is contrary to law and unsupported by the evidence, and that the Board's further finding that the employer broke off bargaining in order to avoid its obligations is not supported in law or in fact. It also contends that the Board's findings are at variance with and beyond the scope of the pleadings.

The employer's position is based primarily upon technical rules of contract law. It states that here the union knew that Fenton had no authority to make a contract, that while Lozano had authority to sign, and did sign, he had conditioned delivery of the contract upon an event which had not occurred, namely, the threat of a shutdown, that in fact, Fenton never delivered the contract and that consequently there was no acceptance by the employer communicated to the union, and therefore no contract, the proposed contract forwarded by Hardin on October 30 containing some provisions different from those tentatively agreed upon at the last bargaining session. The employer bolsters this argument by urging that there was no actual agreement arrived at at the last bargaining session and that even if there were, as between Fenton and Bravo on the one hand and Hardin on the other, this did not constitute an agreement that the employer was required to reduce to writing because it was known to both parties that neither Fenton nor Bravo had authority to arrive at a binding agreement.

The Board does not contest the technical correctness of these arguments. It does not contend that when Lozano and Bravo signed the agreement they thereby "accepted" the "offer" that it contained so as to make it a binding contract. The Board does say that the signing of the agreement by Lozano, who admittedly was the one authorized to make an agreement, is evidence that the terms proposed by the union were agreeable to him. It says further that, under the peculiar circumstances of the case, Fenton's stalling of the union and misrepresentation as to whether Lozano had in fact signed, coupled with assurance that he would sign, indicate a determination by the employer to keep matters in abeyance, rather than to deliver the contract which was in fact acceptable to the employer, in the hopes that, by calling for a new election immediately after December 15, the employer could escape entirely from

its obligation to bargain. The foregoing is not in the language that the Board used, but as we read the Board's findings and conclusions, we think it fairly summarizes the Board's analysis.

█ In our view, the employer's arguments may be accepted as stating good technical contract law, but we do not think that in this particular case they state good collective bargaining law. We do not think that, in deciding whether, under a particular set of circumstances, an employer and a union have in fact arrived at an agreement that the employer is then obliged to embody in a written contract upon the union's request, the Board is strictly bound by the technical rules of contract law.

In N. L. R. B. v. Montgomery Ward & Co., 9 Cir., 1943, 133 F.2d 676, 146 A.L.R. 1045, this court had occasion to review at length the obligation of an employer to bargain and the nature of that obligation. In that case, Judge Garrecht quoted extensively and with approval from the opinion in Wilson & Co., Inc. v. N. L. R. B., 8 Cir., 1940, 115 F.2d 759 as follows:

"Without attempting complete accuracy, we think that the applicable rules of law are, in substance, as follows: While the act does not compel that employer and employees shall agree, it contemplates that agreements will be reached as the result of collective bargaining. [Cases cited] It obligates the employer to bargain in good faith both collectively and exclusively with the chosen representative of a majority of his employees with respect to all matters which affect his employees as a class, including wages, hours of employment, and working conditions. [Cases cited] * * * The requirements which are imposed by the act upon the employer can only be satisfied by an honest and sincere compliance. [Cases cited] When collective bargaining results in agreement, a good-faith compliance with the law requires that the agreement be reduced to writing, unless both parties desire that it remain oral,

or unless some other justifiable ground exists for not putting it in writing. [Cases cited]."

Quoting from N. L. R. B. v. Boss Mfg. Co., 7 Cir., 118 F.2d 187, 189, he continued:

* * * "Collective bargaining, as contemplated by the Act, is a procedure looking toward the making of a collective agreement between the employer and the accredited representative of his employees concerning wages, hours and other conditions of employment. Collective bargaining requires that the parties involved deal with each other with an open and fair mind and sincerely endeavor to overcome obstacles or difficulties existing between the employer and the employees to the end that employment relations may be stabilized and obstruction to the free flow of commerce prevented."

Judge Garrecht also said:

"As we view the statute, it is the obligation of the parties to participate actively in the deliberations so as to indicate a present intention to find a basis for agreement, and a sincere effort must be made to reach a common ground. As was said in N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, 885: 'The respondent, following the beginning of the strike, was legally bound to confer and negotiate sincerely with the representatives of its employees. It was required to do so with an open mind and a sincere desire to reach an agreement in a spirit of amity and cooperation. The cases setting forth this obligation are many, and it is well settled that a mere formal pretence at collective bargaining with a completely closed mind and without this spirit of co-operation and good faith is not a fulfillment of this duty. [Cases cited.]'"

See also, N. L. R. B. v. Nesen, 9 Cir., 1954, 211 F.2d 559, 563–64; N. L. R. B. v. Jeffries Banknote Company, 9 Cir., 1960, 281 F.2d 893, 896.

■ Here, the Board could conclude, as it evidently did, that Fenton had authority to tell the union what he did tell it. Surely, both the union and the Board could infer from what he told the union that the employer had in fact agreed to the terms embodied in the contract, and that all that remained to be done was to deliver the contract, signed by the employer. Under the peculiar facts of this case, the employer had an obligation to deliver the signed contract to the union, and its failure to do so sustains the first charge in the complaint, refusal to sign the agreement as reduced to writing. Obviously, here, "signing" must be taken to mean an effective signing, rather than the undelivered execution which actually took place.

■ We do not at all mean to hold that, in general, the normal rules of offer and acceptance are not determinative as to whether an agreement has been reached in a collective bargaining situation. We do hold that where, as in this case, the terms proposed by the union are in fact acceptable to the employer, but delivery of the signed contract is withheld for the obvious tactical purposes that here appear, it is proper for the Board to conclude that there has been a failure or refusal to execute a written contract incorporating the agreement reached within the meaning of section 8(d). (29 U.S.C. § 158(d)).

■■ We find no merit in the employer's assertion that the kind of stalling and misrepresentation here indulged in does not sustain the second charge made in the complaint, namely, that the filing of the election petition on December 26 was for the sole purpose of unnecessarily obstructing negotiations and of avoiding the employer's legal obligation to sign the agreement as reduced to writing. Fenton's assurances to Hardin were obviously designed to forestall, and did forestall, the occurrence of the event —a threat of shutdown—upon which Lozano conditioned his authority to deliver the signed contract. What happened next is eloquent proof of the real objective of the employer. As the Board puts it: "Respondent's bald attempt to have a contract, if it was to its advantage, but to deny the Union the advantages of the same contract is the very antithesis of good faith bargaining."

To permit an employer to do what this employer did would encourage results directly contrary to the purposes of the collective bargaining provisions of the Act. (See N. L. R. B. v. Howell Chevrolet Co., 9 Cir., 1953, 204 F.2d 79, aff'd 346 U.S. 482, 74 S.Ct. 214, 98 L.Ed. 215; N. L. R. B. v. Parma Water Lifter Co., 9 Cir., 1954, 211 F.2d 258, 263; N. L. R. B. v. Andrew Jergens Co., 9 Cir., 1949, 175 F.2d 130, 136; N. L. R. B. v. Vander Wal, 9 Cir., 1963, 316 F.2d 631, 633–34).

■ There remains the employer's complaint that the findings are at variance with and beyond the scope of the pleadings. This contention is based principally upon the claim, heretofore discussed, that there never was an acceptance of the union's terms by the employer within the ordinary rules of offer and acceptance, and that therefore, the Board's finding of an implied agreement is legally impossible. We think that what we have already said sufficiently disposes of this position. The employer cites a colloquy in the course of which, when the employer offered in evidence the copy of the contract that bore the signatures of Lozano and Bravo, counsel for the Board said: "It is our position that the signatures are of no effect." This statement, however, was in response to the statement by counsel for the employer that the signed document was never delivered to the union, and that the employer was not going to contend that the document was a "signed agreement." It is clear throughout the record that no one misunderstood the employer's position, and that counsel for the Board never contended that the signatures had effect in the sense that they made the agreement a binding written agreement. The Board's entire position was based upon the fact that it did not become, within the law of offer and acceptance, a binding agreement, and that the refusal by the employer, upon the union's re-

quest, to deliver a signed agreement was what constituted the violation. We cannot find that the employer was in any way misled or that the Board's findings are outside of the scope of the pleadings.

The petition to set aside the order is denied, and the order will be enforced as requested by the Board.