NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MRS. FAY'S PIES, Respondent.

No. 19288.

United States Court of Appeals Ninth Circuit.

Feb. 3, 1965.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Morton Namrow, N. L. R. B., Washington, D. C., for petitioner.

Alvin F. Slaight, Jr., Robert M. Mallano, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for respondent.

Before CHAMBERS, HAMLIN and ELY, Circuit Judges.

ELY, Circuit Judge.

Following disputes between Respondent, hereinafter called "Company," and Local 37 Bakery and Confectionery Workers International of America, hereinafter called "Union," the National Labor Relations Board issued an Order, directed against the Company. Here, the Board seeks enforcement of its Order [145 N.L.R.B.No. 48], and there is no issue as to jurisdiction. Sections 10(c) and 10(e), National Labor Relations Act, as amended, 29 U.S.C. ¶ 151 et seq.

The Board determined that the Company failed to bargain in good faith with the Union and that such failure violated Section 8(a) (5) and (1) of that portion of the Act which defines unfair labor practices.[1]

The evidence supports the Board's findings. The Company produced no wit-nesses to contradict the testimony upon which the findings rest.

The uncontradicted testimony establishes the following:

(1) A collective bargaining agreement between the Company and the Union provided for automatic renewal unless sixty days notice of intention by either party to terminate or modify the agreement should be given prior to December 2, 1961. The agreement provided also that in the event of timely notice of modification, either party could, after December 2, 1961, terminate the contract upon twenty-four hours' notice.

(2) In a letter dated September 26, 1961, the Union notified the Company of its intent to modify the existing agreement and requested "an early reply setting a date to meet and commence negotiations." The Company made no reply to this letter.

(3) During the period between September 26th and December 2nd, the Union's President telephoned one Gund, the Company's bargaining representative, on four, five, or six occasions, attempting to schedule a meeting, making it clear that the Union was available for discussions, and advising that it would not be the fault of the Union if negotiations should "run past the expiration which made it necessary to pay retroactive pay." Gund initiated no calls during the period, and his usual reply to the Union calls was to the general effect that he would try to arrange a meeting date with the owner of the Company.

(4) On December 14, 1961, when the first meeting was finally had, the Union orally presented its proposed modifications to the contract. At the close of the meeting, a Company spokesman represented that the Company would "call another meeting very shortly" to propose a "counter-offer." The Union President made another call to Gund between De-

---

1. "Section 8 (a) It shall be an unfair labor practice for an employer—
    "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a).

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;"

cember 14th and December 25th and was advised by Gund that the Company owner was not "available to sit down and negotiate."

(5) Shortly after January 1, 1962, Gund was again telephoned by the Union's President, this time to be told that the President would be away from January 18th to February 1st, that the Union wished "to get the contract settled prior to that time," and that there was "a question of the retroactive pay." Gund replied that the Company owner would not be available for negotiations and in the same conversation stated, "Don't you worry about the retroactive pay. Whatever is negotiated shall be retroactive to when we do negotiate and settle the contract. It will be retroactive and to the expiration of the contract on December 2, 1961." On January 10, 1962, there were forwarded to the Company written versions of the proposed modifications which had been presented orally on December 14, 1961.

(6) After January 30, 1962, there were, in approximately six telephone calls to Gund, efforts by the Union to arrange a second bargaining meeting, the President protesting that the employees were pressing him and that it was imperative that the contract be gotten "out of the way." In each of these conversations, Gund made assurances that any negotiated agreement would be made retroactive to the expiration date of the existing agreement.

(7) Meetings were held on April 11th and April 16, 1962, but no agreement was reached. During the April 16th meeting, the Company orally presented proposals which were forwarded in writing on April 30, 1962. They included an offer of a five cent wage increase which was to become effective subsequently and not retroactively.

(8) At a Union meeting held on May 1, 1962, the employees voted to reject the Company's proposals, and the membership voted to strike unless such could be averted by further negotiations. Upon being advised of the action in a telephone call, Gund, in a later telephone call, told the Union President that the Company owner had stated that "if the people want to walk, let them walk." Gund added that he, Gund, "could see at this time no necessity for any further negotiations."

(9) On May 4, 1962, the Company notified the Union that it was "cancelling the contract" and withdrawing counterproposals which it had made, and upon this action there immediately followed:

(a) Announcement by the Company owner at his called assembly of employees that from then forward "the Company would be a nonunion shop."

(b) Termination notices to certain employees, given on May 7, 1962.

(c) Strike by the employees on May 9, 1962.

(d) Elimination by the Company of a number of benefits previously enjoyed by employees.

(e) Granting by the Company, on May 11, 1962, of wage increases of about twenty cents per hour to all except one of nonstriking employees.

(f) Granting by the Company of a substantial pay increase to another nonstriking employee and payment to striker replacements of wages which exceeded the scale set by the former contract from two to twelve cents per hour.

From the foregoing undisputed facts, among others, the Board concluded that the Company failed to bargain in good faith, that its conduct precipitated the strike, and that the whole circumstances disclosed a desire by the Company to avoid reaching an agreement and to undermine the Union.

Section 8(d) of the National Labor Relations Act, supra, defines collective bargaining in part as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, * * *." No precise definition of "good faith" is made by the statute, and it is said that "[T]he Board

has been afforded flexibility to determine * * * whether a party's conduct * * evidences a real desire to come into agreement." N. L. R. B. v. Insurance Agents' International Union, 1959, 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454.

In N. L. R. B. v. Stanislaus Implement and Hardware Company, Ltd., 226 F.2d 377 (9th Cir. 1955), our court wrote, at page 380,

"An unpretending, sincere intention and effort to arrive at an agreement is required by statute; the absence thereof constitutes an unfair labor practice. N. L. R. B. v. National Shoes, 2 Cir., 1953, 208 F.2d 688; N. L. R. B. v. Shannon, 9 Cir., 1953, 208 F.2d 545; N. L. R. B. v. Nesen, 9 Cir., 1954, 211 F.2d 559.

" 'Good faith' is a state of mind which can be resolved only through an application of the facts in each particular case. N. L. R. B. v. American National Insurance Co., 1952, 343 U.S. 395, 410, 72 S.Ct. 824, 96 L.Ed. 1027."

█ In the determination of a state of mind, the facts are ordinarily applicable only as affording bases from which reasonable inferences may be drawn. We are required to sustain findings predicated upon inferences reasonably drawn from substantial evidence. Universal Camera Corp. v. N. L. R. B., 1950, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Nevada Consolidated Copper Corp., 1941, 316 U.S. 105, 106–107, 62 S.Ct. 960, 86 L.Ed. 1305.

█ Reviewing the recited events, which the Company chose not to dispute, it seems quite clear that they constitute ample evidence, direct and indirect, that the Company evaded its obligation, expressed by the Act, to meet at reasonable times and confer in good faith. Following the Union's first request for bargaining and while it persevered in attempts, from September 26, 1961 until December 14, 1961, to arrange a first meeting, the Company owner was always unavaila-

ble; [2] however, following the rejection of the Company's counterproposals, he made himself promptly available to announce, with apparent disdain, that "if the people want to walk, let them walk." Moreover, he appeared willing and immediately available to summon the workers to his presence to be advised that the Union contract had been canceled and that the "shop would be a nonunion shop." The services of certain employees were summarily terminated, and following the strike, the employees were divested of substantial and preexisting benefits. The Company had failed, in its counterproposals, to fulfill repeated promises to offer to apply wage benefits retroactively, yet, following the strike, it promptly instituted to nonstriking employees a wage increase amounting to four times that which had been proposed in the long-delayed counterproposals which were made approximately three weeks before. And, as a final thrust, it paid striker replacements wages in excess of those which it had paid its constant employees under the expiring contract.

All of these circumstances, viewed in total combination, fairly, and indeed justly, led to the conclusion that the Company, with studied deliberation, sought to subvert employee confidence in the Union's representation and determined to frustrate, rather than promote, the quality of reasonably cooperative negotiation required by the law and essential to stable industrial relations and economic progress in an ordered society.

█ Paragraph 1. (c) of the Board's Order is a broad and ambiguous mandate and, under the authority of Morrison-Knudsen Co., Inc. v. N. L. R. B., 276 F.2d 63 (9th Cir. 1960), cert. den., 366 U.S. 910, 81 S.Ct. 1082, 6 L.Ed.2d 234, will be stricken from the Decree; otherwise,

The Petition for Enforcement is granted.

---

2. See N.L.R.B. v. Andrew Jergens Co., 175 F.2d 130, 134 (9th Cir. 1949), cert. den., 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503, wherein the court draws an inference of "stalling" tactics and N.L.R.B. v.

Feed & Supply Center, Inc., 294 F.2d 650, 652 (9th Cir. 1961), wherein a party's bargaining representative delayed negotiations by repeated excuses "that he had to talk to his client."