**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**EASTERN MASSACHUSETTS STREET RAILWAY COMPANY, Respondent (two cases).**

**Nos. 5030, 5089.**

United States Court of Appeals
First Circuit.

July 31, 1956.

Fannie M. Boyls, Washington, D. C., Attorney, with whom Theophil C. Kammholz, General Counsel, David P. Findling, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Maurice Alexandre, Attorney, Washington, D. C., on brief, for petitioner.

J. Joseph Maloney, Jr., Boston, Mass., for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

Both of these petitions for enforcement of orders of the National Labor Relations Board rest basically upon the propriety of a finding made by the Board under § 9 (b) of the Labor Management Relations Act, 1947, 61 Stat. 143, 29 U.S.C.A. § 159(b) that only a company-wide unit of the Respondent's operating and maintenance employees was appropriate for the purpose of collective bargaining between the Respondent and those employees. The petitions also present questions of compliance with § 9(f) of the Act by one of the labor organizations involved, questions with respect to alleged discriminatory discharges of several employees, questions of union domination and support, questions of refusal to bargain, and a question of procedure.

■ The Respondent in previous incarnations owned and operated an electric street and inter-urban railway system regularly serving the eastern Massachusetts area and a few communities in Rhode Island. It now and for many years past has served the same area with motor buses. The gasoline it uses is purchased locally but is transported to Massachusetts from points outside the Commonwealth, it leases tires shipped to it from Ohio, and it purchases buses manufactured outside Massachusetts. The population of the area it serves is over 1,500,-000 and its gross annual revenues for the years involved was far in excess of $6,-000,000. The facts essential to the Board's basic jurisdiction in the premises are clearly established. Indeed, the Respondent does not contend that its activities do not subject it to the jurisdiction of the Board.

The Respondent maintains its central office in Boston where it employs about 25 persons including its principal officers. Following the pattern established by its predecessors the Respondent is divided into 11 operating divisions, each centered in a major city in the area and each under the supervision of a manager who has wide discretion and authority in the operation and control of his division. Although the Respondent operates some lines connecting two divisions, most of its business is not done between divisions but within divisions.

The employees in each division are organized into locals of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, AFL. They have been similarly organized for many years and ever since 1906 the Respondent and its predecessor companies have had agreements with the separate locals. Since 1910 the local unions have been represented in bargaining with the Respondent by a committee called at first the Joint Conference Board and in later years the General Conference Committee (GCC hereinafter) consisting of the presidents of the 11 locals and sometimes a representative of the maintenance employees.[1] The Board, or Committee, has always negotiated single agreements covering all employees in the system but it has never been a party to a collective bargain agreement. Amalgamated was a party to the agreements until 1947, but since then the only contracting parties have been the Respondent and the eleven local unions.

Late in 1951 the GCC requested changes in the contract for the ensuing year and the parties began negotiations with respect to those changes. Many bargaining sessions were held, but in spite of efforts on both sides the parties reached an impasse over requests by GCC for changes in the existing pension plan. In this situation of stalemate, Amalgamated polled its membership throughout the Respondent's system and the employees voted almost unanimously to strike. The strike began on March 10, 1952, but nevertheless the Respondent and the GCC continued to bargain for the next three months.

On June 21, 1952, Amalgamated's local in the Respondent's Lowell Division, No. 280, voted to abandon the strike and on

1. Such representation is in accordance with Amalgamated's constitution which provides that contracts or agreements shall be negotiated jointly when its members are employed by the same employer but belong to different locals.

the following day all but 19 of its members returned to work. Two days later the GCC notified the Lowell Local, as we shall refer to it hereinafter, that it would ask Amalgamated to revoke that local's charter and on the next day the GCC did so. The Lowell Local's executive board thereupon voted to enter into a contract of its own with the Respondent and on June 25 its representatives met with officers of the Respondent and advised them of the Lowell Local's desire for a separate contract. The Respondent immediately drafted a contract with the Lowell Local containing the same provisions as its 1950 contract with all the locals, except for a wage increase of $.15 an hour. That contract was signed before the meeting broke up. Two days later, on June 27, the Respondent wrote letters to the 19 members of the Lowell Local who had not returned to work with the others informing them that they were "suspended indefinitely," a euphemism for "fired" frequently employed by the Respondent in its dealings with its employees.

On July 8 a majority of the employees in all eleven divisions voted to end the strike provided the Respondent reinstated the 19 "suspended" Lowell strikers, and after some hesitation the Respondent, contending that reinstatement of those men was a matter to be settled only with the Lowell Local, agreed on July 13 to do so. On July 15 the strike ended and all the strikers returned to work.

In the meantime on June 30 Amalgamated suspended the Lowell employees who had voted to abandon the strike on June 21 and returned to work on June 22 and put its vice-president O'Brien in charge of the Lowell Local as trustee. On July 2 O'Brien advised the Respondent of Amalgamated's action putting him in charge of the Lowell Local but it is not altogether clear that the notice he gave was sufficient to inform the Respondent of his and Amalgamated's position that from then on O'Brien officially represented the Lowell employees in place of one Casserly, the duly elected president of the Lowell Local. At any rate,

negotiations during the rest of the summer and early fall between the GCC and the Respondent came to nothing for the reason that the GCC insisted upon bargaining for the Respondent's employees in all its divisions whereas the Respondent asserted that its contracts were with the separate locals, that it already had a contract with the Lowell Local, and that it would not recognize the GCC as the bargaining representative for its Lowell employees.

On October 23 Amalgamated expelled Casserly, the suspended president of the Lowell Local, and thereafter on November 1 most of the members of the Lowell Local severed their connection with Amalgamated and retaining Casserly and their other old officers organized an unaffiliated union of their own which they called Transit Workers Local No. 1. This union took over and continued the Lowell Local's contract of June 25 with the Respondent, and the Respondent recognized it as the bargaining representative of its Lowell employees. Meanwhile the Lowell Local continued as an entity under the trusteeship of Amalgamated's vice-president O'Brien and an assistant, an employee named MacLean, whom some 15 or 16 of the 19 Lowell employees who continued on strike after their fellows had returned to work had appointed to represent them in subsequent dealings with the Respondent.

On the facts just summarized the Board, one member dissenting, found in the decision upon which it based the order which it asks us to enforce in its first petition, No. 5030, that in view of the integrated nature of the Respondent's operations and its long practice of bargaining with a single agent (the GCC) representing the operating and maintenance employees in all its 11 divisions, a bargaining unit consisting of its Lowell employees alone was inappropriate, that the appropriate unit was company-wide, and that the bargaining representative of a majority of the employees in that unit was Amalgamated's 11 locals acting jointly through the GCC. From this the Board said that it followed, as alleged in

the complaint, "that when the Company dealt with the Lowell Local as representing a mere fraction of this appropriate unit, at the very time when the Association [meaning in context Amalgamated's 11 locals acting together through the GCC] had the right, and in fact was insisting upon exercising it, to represent all the Company's employees, its conduct constituted a refusal to bargain with the majority representative in the appropriate unit and therefore a violation of Section 8(a) (5) of the statute." Then the Board went on to say: "Similarly, the recognition which it accorded the Lowell Local as bargaining agent in the inappropriate grouping of a minority of the employees, at a time when it was under obligation to bargain with the duly designated majority representative in the appropriate unit, was unlawful assistance to the Lowell Local and therefore a violation of Section 8(a) (2)."

The Board's finding that the Respondent unlawfully dealt with and thereby unlawfully contributed support to the Lowell Local and later to Transit Workers Local No. 1 in violation of § 8(a) (2) of the Act follows as a logical corollary from the Board's basic finding that the Respondent violated § 8(a) (5) of the Act by refusing to bargain collectively with the company-wide employee unit it found to be appropriate for that purpose. We do not understand the Respondent seriously to argue to the contrary. But before we consider the propriety of the Board's unit determination on which its finding of refusal to bargain rests, we must consider the question of GCC's compliance with § 9(f), for that is a jurisdictional requirement.

The proceedings of the Board under § 10 of the Act as a result of which the Board issued the order it asks us to enforce in its first petition, No. 5030,[2] rest basically upon five unfair labor practice charges, one filed by the GCC, one filed by the 11 locals, and three filed by individual employees. Complaints issued on these charges and the complaints were eventually consolidated for hearing. In the view we take of the case no useful purpose would be served by analysing the charges, complaints, answers and consolidation orders in detail. It will suffice to say that the charge filed by GCC and the complaint issued thereon alleged that the Respondent, among other unfair labor practices, refused to bargain with the GCC as the exclusive representative of the appropriate employee unit consisting of the operating and maintenance employees in all its 11 divisions, and that the Respondent in its answer to the complaint alleged in addition to denying the asserted unfair labor practices "that if said General Conference Committee is a labor organization within the meaning of § 2(5) of the Act,[3] it has not complied with the requirements imposed on labor organizations by §§ 9(f), 9(g) and 9(h) of the Act, and no complaint should have been issued pursuant to charges purportedly filed by it."

Counsel for the Respondent at the hearing before the trial examiner undertook to prove his allegation of non-compliance by the GCC by questions directed first to a former officer and later to a present member of the GCC. Counsel for the General Counsel objected in both instances and his objections were sustained by the trial examiner who ruled that GCC's compliance with § 9(f), (g) and (h) was a matter for administrative determination which was not litigable in either compliance or representation proceedings. The trial examiner added: "We must presume that the General Counsel, as an able and conscientious servant of the government, has made an administrative determination that the General Conference Committee is in compliance with § 9(f), (g), and (h) of the Act." Respondent's counsel then made an offer to prove GCC's non-compliance. His offer was rejected, and he listed an objection to that ruling in the exceptions to the trial ex-

2. The other petition, No. 5089, presents no issue of compliance.

3. The Board found that the GCC was such a labor organization and that finding is not challenged by the Respondent.

**706**

aminer's report which he filed with the Board. The Board did not consider this objection specifically but affirmed the trial examiner's ruling thereon in a general statement affirming all his rulings.

 Certainly counsel for the Respondent preserved his client's right to have its contention considered by this court. See § 10(e) of the Act. And in N. L. R. B. v. Puerto Rico Food Products Corp., 1956, 232 F.2d 515, this court held that when properly challenged in enforcement proceedings the Board must come forward with evidence to show compliance by the labor organization or organizations involved with the filing requirements of § 9(f), (g) and (h) of the Act[4] and give the Respondent a chance to refute that evidence if it could. This court felt then, as it does now, that there was an analogy between an administrative determination of compliance and allegations of diverse citizenship in a complaint under the diversity jurisdiction. That is to say, we were of the opinion that an administrative determination of compliance could properly be given face value, in the same way that face value is given to allegations of diverse citizenship in a diversity action. But when the administrative determination of compliance is properly challenged, then, as in the case of a challenge to the allegation of diversity of citizenship, the Board, as the party asserting jurisdiction, like the plaintiff in a diversity action, must come up with evidence to support the allegations on which it rests the jurisdiction it seeks to invoke. Thus we concluded that it was incumbent on the Board when challenged to produce evidence of the filing of the reports and affidavits which § 9(f), (g) and (h) require to be on file before the organization can invoke the enumerated procedures and remedies of the Board.

We rested our conclusion in the Puerto Rico Food Products Corp. case upon inferences, admittedly not altogether clear, drawn from the language used by the Supreme Court in N. L. R. B. v. Coca-Cola Bottling Co. of Louisville, Inc., 1956, 350 U.S. 264, 76 S.Ct. 383, and upon the ground that at least as to § 9(h) the fact of compliance was so closely interwoven with the necessity for compliance that to prevent an employer from litigating the former might operate to deprive him of the power to exercise his right under N. L. R. B. v. Highland Park Mfg. Co., 1951, 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969, and the Coca-Cola Bottling Co. case, supra, to litigate the latter. If we were right in the Puerto Rico Food Products Corp. case, then it follows that the trial examiner was wrong in rejecting the Respondent's offer of proof and the Board was wrong in affirming the trial examiner's ruling.

 But it now appears that counsel for the Respondent under his general offer of proof was not proposing to show that the reports required by § 9(f) and (g) had not been filed on behalf of the GCC or that its officers had not filed the non-communist affidavits required by § 9(h). His proposal instead was to show that some of the reports filed by the GCC were false. He says in his brief that "Respondent was prepared to prove that much of the material filed by the GCC pursuant to Sections 9(f) (A) (2) and (6), and 9(f) (B) (1) and (2), on which material the General Counsel based his administrative determination of compliance, was false to such an extent as to amount to a nullity in terms of complying with the Act and known to be so false by the officers of the GCC when it was filed."

This is quite another matter as we pointed out in our opinion in the Puerto Rico Food Products Corp. case. The reason for this is that the statutory sanction for failing to file the documents and affidavits required by § 9(f), (g) and (h) is denial of access by the labor organization involved to the enumerated Board procedures and remedies, whereas the sanction for filing false documents and affidavits is the heavy criminal penalty imposed by Title 18 U.S.C. § 1001 quoted

---

4. See Title 28 U.S.C. § 1733(b).

in the margin.[5] This sanction as to false non-communist affidavits is specifically imposed by the last sentence of § 9(h) which makes § 35A of the Criminal Code, now in pertinent part § 1001, supra, applicable to them. There is no reason whatever to suppose that Congress by specifically imposing a criminal sanction in § 9(h) by inference intended not to impose the criminal sanction which otherwise would be applicable in the event false reports were filed under § 9(f) and (g). And we assume from the clear imposition of a criminal sanction for filing false reports and affidavits that no other was intended. At least we are not inclined to infer the imposition of any sanction other than the criminal one in the absence of any indication to that effect in the Act.

■ Our conclusion, therefore, is that when challenged in a proceeding such as this the Board is called upon to support its assertion of jurisdiction by coming forward with evidence of what reports have been filed on behalf of the charging labor organization under § 9(f) and (g) and which officers of that labor organization have filed non-communist affidavits under § 9(h), and afford the challenging Respondent an opportunity to refute that evidence if it can. But we hold that a Respondent in proceedings of this sort cannot introduce evidence of the falsity of any of the reports or affidavits on file. We express no opinion on the problem that would arise in the event the Board should undertake to process a charge by a labor organization after a determination, either administrative or in a criminal prosecution, that one or more of its reports filed under § 9(f) and (g) or of the affidavits filed under § 9(h) was in fact false. See Farmer v. United Electrical, Radio & Machine Workers, 1953, 93 U.S.App.D.C. 178, 211 F.2d 36, certiorari denied, 1954, 347 U.S. 943, 74 S.Ct. 638, 98 L.Ed. 1091; Farmer v. International Fur & Leather Workers Union, 1955, 95 U.S.App.D.C. 308, 221 F.2d 862; and N. L. R. B. v. Lannom Mfg. Co., 6 Cir., 1955, 226 F.2d 194, certiorari granted sub nom. Amalgamated Meat Cutters & Butchers Workmen of North America, AFL–CIO v. N. L. R. B., 1956, 351 U.S. 905, 76 S.Ct. 695.[6]

■ It follows that while we think the trial examiner and the Board erred in rejecting the Respondent's broad offer of proof under which it might have shown failure by the GCC or its officers to file the documents required, the error later proved harmless in the light of the Respondent's assertion that what it actually wanted to prove was not any failure to file but the falsity of some of the documents submitted for filing.

■ Turning back now to the Board's bargaining unit determination we find no abuse by the Board of the powers conferred upon it in § 9(b) of the Act. In pertinent part that section reads: "The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising

5. "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

6. The Court of Appeals for the District of Columbia Circuit in the Farmer cases held that the Board had no authority to inquire as to the truth or falsity of non-communist affidavits filed by union officers and so could not deprive a union of its compliance status under § 9(h) on the ground that its president's non-communist affidavit was false. But the Court of Appeals for the Sixth Circuit in the Lannom Mfg. Co. case on motion dismissed a Board petition for enforcement on the ground that the charging union's president had been convicted for filing a false non-communist affidavit covering a year preceding the year in which the union's unfair labor practice charge was filed. These cases impale the Board on the horns of a dilemma. There will be time enough to consider the Board's predicament when, if ever, the occasion arises.

the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof". This general language confers broad powers upon the Board. "The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed." Packard Motor Car Co. v. N. L. R. B., 1947, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040. And in this case we can say as the Supreme Court said in the above case, "While we do not say that a determination of a unit of representation cannot be so unreasonable and arbitrary as to exceed the Board's power, we are clear that the decision in question does not do so. That settled, our power is at an end." The fact that the Respondent's operations are of the same nature in all its divisions, and its and its predecessors' practice for nearly a half a century of dealing with its employees on a system-wide basis, are clearly sufficient to support the Board's determination that only a company-wide unit was appropriate for the purposes of collective bargaining between the Respondent and its employees.

Respondent argues further, however, that even if the Board's company-wide unit determination is proper, no violation of § 8(a) (5) can be based thereon for at the time of the supposed violation Respondent believed in good faith that the smaller unit was appropriate. The short answer to this is that we find no basis for setting aside the finding of the trial examiner adopted by the Board that the Respondent entertained no such bona fide belief.

From this determination of violation of § 8(a) (5), as we pointed out earlier in this opinion, follows the conclusion that the Respondent by recognizing and dealing separately with the Lowell Local and Transit Workers Local No. 1 gave those unions support in violation of § 8(a) (2) of the Act. Moreover,

additional support for this latter conclusion is found in the Respondent's dealings with the employees allegedly discriminatorily discharged as will presently appear.

The Board found that after the strike the Respondent discriminated against several of its employees for their adherence to Amalgamated, its local unions and the GCC. The two petitions cover the cases of eight men, one an employee in the Haverhill Division and the other seven members of the Lowell Local who had not returned to work when a majority of the members of that local abandoned the strike on June 22, 1952. The Board found that the Haverhill employee and two of the Lowell employees were discharged solely for their activities on behalf of Amalgamated and GCC. It ordered these men reinstated to their former or equivalent positions with back pay and without loss of seniority. The Board found that the other five, one of whom was O'Brien's assistant, MacLean, mentioned above, while ostensibly discharged for cause, in fact were discriminatorily discharged for their union activity. The general pattern of discrimination found by the Board in all these five cases was the same. It was to impose the penalty of "indefinite suspension" on the men for relatively minor infractions of company rules and then to require them to process their grievances, not through Amalgamated's vice-president O'Brien as trustee in charge of the Lowell Local, but through Casserly, at first as the suspended president of that local and later as the president of Transit Workers Local No. 1, with whom they were known to be out of sympathy, if not at swords points, and unwilling to deal. The Board found that by this tactic the Respondent not only discriminated against the men illegally in violation of § 8(a) (3) by imposing a heavier penalty for their derelictions, in practical effect discharge, than would otherwise have been meted out, but also in the process gave illegal support to the Lowell Local and Transit Workers Local No. 1 in violation of § 8(a) (2) of the Act.

The Board found that on the basis of the eventual punishments inflicted after pursuit of grievance procedures upon other employees for comparable offenses the maximum punishment these five men would have received for their violations of company rules, had they followed the grievance procedures insisted upon by the Respondent, would not have exceeded ten days suspension from work. It found, therefore, that had these men set the grievance procedures required by the Respondent in motion, their "indefinite suspensions" would have been reduced to ten days. Finding also that the Respondent's requirement that grievances be processed through Casserly and his locals was discriminatory as to these men as well as an unfair labor practice in itself under § 8(a) (2), the Board concluded that only the Respondent's discriminatory conduct kept the men's suspensions from being reduced to the usual level of company punishments for offenses such as theirs. It therefore ordered these men reinstated on the usual terms but less ten days back pay.

 Little or no purpose would be served by analysing each man's case in detail. It will be enough to say that although in one instance the case is close, we are satisfied from a study of the record that in every instance the Board's findings of fact and inferences therefrom are supported by substantial evidence. The serious question on this phase of the case is whether the Board had authority under the Act to order reinstatement of the five men the Board found to deserve suspensions for ten days for infractions of company rules but not "indefinite suspensions," that is to say, in effect, discharge.

 The Respondent contends that in ordering the five men reinstated with any pay at all the Board flouted the clear mandate of the sentence in § 10(c) of the Act which reads: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the pay-ment to him of any back pay, if such individual was suspended or discharged for cause."

The purpose of this provision is to make it abundantly clear that the Board is not to interfere with the exercise by employers of their traditional right to discharge employees for adequate cause. N. L. R. B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893. Thus reinstatement has been denied to employees discharged for rank insubordination, wilful disobedience or disloyalty, such for instance as disparaging their employer's services to the public at a critical time in the development of the business, N. L. R. B. v. Local Union No. 1229 International Brotherhood of Electrical Workers, 1953, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 or, no doubt, beating a plant manager, cf N. L. R. B. v. Efco Mfg., Inc., 1 Cir.. 1955, 227 F.2d 675, and this even though the employee's offense was committed in connection with a protected activity. But the provision is not to be construed to provide a cloak protecting an employer when he uses his right to discharge for the purpose of intimidating or coercing his employees in the exercise of their rights under the Act. And this occurs when an employer discharges an employee for a minor offense ordinarily punished by not more than a few days suspension where the Board finds on adequate evidence that the excess punishment was really for engaging in a protected activity. That is this case, for the Board found that breaking company rules was merely a pretext, not the cause, for discharging the men. It found on evidence we consider wholly adequate that because these five men had not processed their grievances through the union the Respondent was unlawfully assisting and with which the men would not and perhaps for personal reasons could not, deal, it discriminatorily failed to reduce the punishments inflicted upon them for breaking company rules. Thus the Board concluded, we believe correctly, that the total punishment inflicted on the men was

not for their infractions of company rules but for their insistence upon their protected right to process their grievances through their proper collective bargaining agent, Amalgamated and its duly constituted locals acting through the GCC, and no other. The remedy afforded is certainly appropriate for the offense.

Only the procedural question remains for consideration.

 The basic substantive questions we have so far considered are all presented by the first petition. The second petition presents nothing new of that nature. It presents only the question of the discriminatory discharges of two of the men whose cases we have already considered, because both of them were discharged under the same circumstances as the men covered in the first petition. The second petition is definitely a sequel or mere appendage of the first.

When the cases of the men with whom we are concerned in the second petition came on for hearing before a trial examiner the hearing in the first case had been completed and the trial examiner had filed his intermediate report but the Board had not yet handed down its decision and order. In this situation counsel for the General Counsel asked for a continuance until the Board had decided the first case in order to avoid the necessity of retrying on the same evidence the basic issues of unit determination, union support and employer discrimination common to both which had taken weeks to try. The trial examiner granted the motion after determining that the parties would neither enter into a stipulation as to the parts of the record in the first case which were relevant, nor agree to include the entire record in the first case as part of the record in the case then on trial. Thus the trial examiner had to choose between relitigating matters already tried but not yet decided or continue awaiting decision. Certainly in this situation it cannot be said that he abused his discretionary powers in granting the continuance.

Decrees will be entered enforcing the orders of the Board.