**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GREAT FALLS EMPLOYERS' COUN- CIL, INC., et al., Respondents.**

**No. 16565.**

United States Court of Appeals Ninth Circuit.

April 27, 1960.

Stuart Rothman, Gen. Counsel, Thomas J. McDermott and Marcel Mallet-Prevost, Asst. Gen. Counsel, Fannie M. Boyls, Standau E. Weinbrecht, Attys., N. L. R. B., Washington, D. C., for petitioner.

Howard C. Burton, Great Falls, Mont., for respondent.

Before ORR, POPE and HAMLEY, Circuit Judges.

POPE, Circuit Judge.

The petitioning Board seeks enforcement of its decision and order finding the respondent Great Falls Employers' Council and its member employers guilty of unfair labor practices within the meaning of § 8(a) (3) and 8(a) (1) of the National Labor Relations Act, as amended.[1] The facts were all stipulated and the case was submitted directly to the Board. The decision and order are reported in 123 N.L.R.B. 109, where the facts are set forth in more detail than is necessary here.

The respondent Employers' Council is an employer association and the collective bargaining agent of eight member employers, each of which operated food stores at Great Falls, Montana. These employers, through the Council, had a collective bargaining agreement with Local 57 of the Retail Clerks International Association which was exclusive bargaining representative of the respondents' grocery clerks.[2] The agreement expired by its terms on March 31, 1957, but was continued in effect by mutual agreement of the parties. Bargaining sessions, looking to a new agreement, began on February 22, 1957, and continued until April 12, when the Council submitted a "final proposal". This the Union rejected and voted to strike one employer member,—the respondent Buttrey. When picketing of Buttrey's stores began, the remaining employers locked out their employees represented by the Union, stating that they did so "to preserve their interest in group bargaining, as guaranteed by law."

The Board agreed with respondent's contention that this lockout, so initiated, was properly privileged under the decision in National Labor Relations Board v. Truck Drivers Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676. Said the Board: "The parties agree that Respondents' purpose in locking out their non-striking employees was only to protect the multi-employer unit from the disintegration threatened by the Union's tactic of calling a 'whipsaw' strike against one employer member in support of demands against all. Such a strike threat 'per se, constitutes the type of economic operative problem at the plants of the non-struck employers which legally justifies their resort to a temporary lockout of employees.' "[3]

1. The relevant provisions of the National Labor Relations Act, as amended (61 Stat. 136, 29 U.S.C.A. § 151 et seq.), are as follows: "Rights of Employees Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)."

"Unfair Labor Practices Sec. 8. (a) It shall be unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: \* \* \*."

2. These included all sales clerks, checkers, produce clerks, shipping clerks, stock clerks, delivery men, etc.

3. This last quotation by the Board is from National Labor Relations Board v. Truck Drivers Union, supra.

This initial lockout was followed by other action of these employers, and that further action is what the Board held improper. It came about in the following manner: when the Union voted to strike Buttrey it plainly anticipated that a lockout might follow; so it instructed its members that in case of such a lockout all locked-out employees should register with the Montana Employment Service for other jobs in order to qualify for unemployment compensation. Under the Montana law a claimant who so qualified would be entitled to payments from the unemployment compensation fund of $32 per week for a period of 22 weeks.[4]

The strike and lockout began on Saturday, April 13. On Monday following, April 15, most of the locked out employees applied to the Montana Unemployment Compensation Commission for unemployment benefits. The respondents protested to the Commission against payments to these employees. The Montana law denies benefits to a claimant whose unemployment "is due to a stoppage of work which exists because of a labor dispute" at the place of his last employment (subject to certain exceptions not here relevant). Also a claimant is disqualified for any week in which he has received employment exceeding an eight-hour day and wages exceeding $15. Respondents, in their protest to the Commission, asserted these employees were involved in a work stoppage because of a labor dispute, within the meaning of the law's disqualifying clause. But apparently to make sure that no benefit payments would be made, each employer, on April 17, called his employees to return to work on April 19, at a specified hour, and to work on April 19 and 20 until each had earned $16 in that week. In like manner they were called to work on two days in the succeeding week to earn another $16.[5]

When these employees requested guidance from the Union, they were urged to comply with the employers' call to work, and when they did so, on April 19, they were kept on until such time, on April 20, as their earnings reached $16. Then they were released. The same thing happened during the following week, when each employee was permitted to earn $16 on April 26 and April 27. On April 27, a new contract was concluded and reemployment then became regular and the so-called intermittent lockout terminated.

The Board by a vote of three to two, held that thus locking out their recalled employees "was a manipulation of tenure and terms of employment which infringed upon the collective bargaining rights of these employees and tended to discourage support of the Union and con-

4. The relevant provisions of the state statute, Chapter 140, Montana Session Laws of 1957, were set forth in an exhibit made a part of the stipulation.

5. The stipulation described the respondents' efforts to prevent payment of benefits as follows: "The Respondents, taking note of prior decisions of the Montana Unemployment Compensation Commission, admittedly then sought ways and means of curtailing what they thought to be an unprincipled use of the Montana State Unemployment Compensation Fund. Being advised that a direct protest and a definitive appeal would take from weeks to years and that compensation might nevertheless be paid pending the appeal, they sought means of effectively preventing payment of unemployment compensation to the locked out employees pending an appeal. They concluded that an offer of partial reemployment which would extend longer than one shift and would permit the locked out employees to earn $16 per week would have three consequences, any one of which would disqualify the locked out employees from receiving unemployment benefits:

1. If the Union directed the employees not to return to work, they would become strikers and would clearly not be entitled to benefits under prior decisions of the Commission.

2. If the employees individually declined offered employment, they would disqualify themselves for benefits under the provision of the law.

3. If they returned to work for $16 per week, they disqualified themselves from benefits under the law."

certed activity for mutual aid or protection in violation of § 8(a) (3) and (1) of the Act."

In one respect the situation here was anomalous; for as the record shows, when the claims of these employees for unemployment compensation were ultimately determined, a month after the strike was over, the Montana Commission denied them, holding that the work stoppage existed because of a labor dispute at Respondents' stores. This means that at no time were the employees entitled to the claimed benefits. So the net result of the recall of the employees was that they were able to earn $16 each week—just $16 more than they would have had had the original lockout been maintained without interruption. If the recall device was intended as an economic weapon, actually, to the extent of $16 a week, it operated as an economic aid.

■ We consider first the asserted violation of § 8(a) (3), that Respondent's conduct here had amounted to a practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." The primary question here is, where is there discrimination? The Board's decision furnishes no answer to this question,—it is not there discussed or even noticed. The employers' action in recalling their employees, and then releasing them, was, as the Board's decision discloses, in no sense selective,—it operated as to all employees; none were preferred; none were excluded; all were treated alike. As the Board put it, each employer "requested its employees to report to work at specified hours." On April 20 "as soon as each recalled employee had earned a total of $16, he was again released by his employer."

■ "The language of § 8(a) (3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited." Radio Officers etc. v. National Labor Relations Board, 347 U.S. 17, 42, 74 S.Ct. 323, 337, 98 L.Ed. 455. Whether the conduct of these employers violated some other section of the Act is something we shall have occasion to consider later in this opinion. But so far as § 8(a) (3) is concerned, to treat this conduct as discretionary action under that section finds no basis in reason or in precedent.[6]

---

6. What sort of employer action does constitute discrimination which tends to discourage union membership is illustrated by the following cases:

1. Discharging an inordinately high proportion of union members in relation to nonunion employees when there is a business cut-back. National Labor Relations Board v. Sandy Hill Iron & Brass Wks., 2 Cir., 165 F.2d 660, 662.

2. Shifting seniority policy following strike so as to give preference to nonstrikers and employees who had returned to work during strike when no tenure promises were made to nonstrikers. Olin Mathieson Chemical Corp. v. National Labor Rel. Bd., 4 Cir., 232 F.2d 158, affirmed without opinion, 352 U.S. 1020, 77 S.Ct. 587.

3. Indefinitely suspending employees who insisted on processing their grievances through their proper collective bargaining agent, instead of an insurgent local which the employer recognized. National Labor Relations Board v. Eastern Massachusetts St. Ry. Co., 1 Cir., 235 F.2d 700, 709–710.

4. Refusing to hire a man because of the belief that he was an active union member and had recently given testimony against a former employer in an unfair labor practice proceeding. National Labor Relations Board v. Lamar Creamery Co., 5 Cir., 246 F.2d 8, 8–10.

5. Discharging an employee who was soliciting union applications from co-workers in an effort to organize the employer's plan. I. C. Sutton Handle Factory v. National Labor Rel. Bd., 8 Cir., 255 F.2d 697, 698.

6. Discharging an employee because she was married to a leader of union organization and was herself an active unionist. National Labor Relations Board v. Newton Co., 5 Cir., 236 F.2d 438, 444.

7. Threatening and interrogating em-

There is no suggestion in this case that the respondent employers were hostile to the Union as such. The stipulation shows that this same Employers' Council had recognized and dealt with the Union since 1948 as the authorized representative of their employees. In this respect the case is like National Labor Relations Board v. Adkins Transfer Co., 6 Cir., 226 F.2d 324, 328, where the court noted: "Respondent had no feeling against the labor union. All of his employees were already members of the union, and his relations with them and the union were friendly and cooperative." This case bears no resemblance to that of an employer who seeks to destroy or hamper a union as such by encouraging a company union, or undercutting the union by unilateral action granting wage increases, or otherwise undertaking to make union organization impossible or difficult.[7] We find no § 8(a) (3) violation here.

■ Nor can we find any basis in law for the finding of a violation of § 8(a) (1) or of § 7 to which it refers. In view of National Labor Relations Board v. Truck Drivers Union, supra, the Board necessarily held the original lockout lawful and proper. But when the Board proceeded to hold that the employers' subsequent conduct, designed to make the lockout, and its normal results fully effective, was unlawful, we think it assumed to exercise a power which it did not have.[8] For until some millenium arrives when contests between the employer and his employees can be settled by some process of adjudication, it must be recognized that "collective bargaining is a brute contest of economic power somewhat masked by polite manners and voluminous statistics." N. L. R. B. v. Insurance Agents Union, 361 U.S. 477, 489, 80 S.Ct. 419, 4 L.Ed.2d 454.[9]

"The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized. * * * [T]he truth of the matter is that at the present statutory stage of our national labor relations policy, the two factors—necessity for good-faith bargaining between the parties, and the availability of

ployees regarding their union activities, and discharging numerous union members in an effort to restrain them in the exercise of their § 7 rights. National Labor Relations Board v. Monroe Feed Store, 9 Cir., 237 F.2d 116, 117.

8. Discharging employees who went on strike to obtain recognition of a union other than the company union the employer was supporting. National Labor Relations Board v. Summers Fertilizer Co., 1 Cir., 251 F.2d 514, 519.

7. The Board's theory is apparently suggested by that portion of its decision, above quoted, which states that respondents' action "tended to discourage support of the Union." This proves too much. It might equally be said that any stand taken by an employer which effectively blocks a Union's demands was one which "tended to discourage support of the Union." An employer who holds on for a wage cut when the union demands a raise, or who succeeds in filling with new recruits all places vacated by strikers, (see National Labor Relations Board v. Mackay Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381), would just as fully "dis-

courage support of the union", but no one would suggest that the Board could dictate a suspension of such conduct.

We distinguish, as this court did in Leonard v. National Labor Relations Board, 9 Cir., 205 F.2d 355, 358, cases like N.L.R.B. v. Somerset Classics, 2 Cir., 193 F.2d 613, where the lockout is used to block initial efforts to unionize the plant. See National Labor Relations Board v. Sifers, 10 Cir., 171 F.2d 63.

8. The two-man minority on the Board said: "It is therefore a manifest absurdity to say, as does the majority, that Respondents, by recalling these employees for $16 worth of work and again laying them off for the purpose of disqualifying them under the state unemployment compensation statute, were 'not seeking to protect their legitimate interest in bargaining on a group basis.' Indeed, this action was calculated to, and did, protect the unit by preserving for the Respondents the quiet enjoyment of other rights in the Buffalo linen case."

9. The Court was quoting from Cox, The Duty to Bargain in Good Faith, 71 Harv. L.Rev. 1401, 1409.

economic pressure devices to each to make the other party incline to agree on one's terms—exist side by side. * * * But as we have developed, the use of economic pressure by the parties to a labor dispute is not a grudging exception to some policy of completely academic discussion enjoined by the Act; it is part and parcel of the process of collective bargaining." National Labor Relations Board v. Insurance Agents, supra, 361 U.S. at page 489, 80 S.Ct. at page 427.

It is true that the language just quoted was used in a case in which a union was charged with a refusal to bargain in good faith. (A similar charge against the respondents here was rejected by the Board.) But the Court's recognition of the place of the use of economic pressure by either party to a labor dispute is just as authoritative here. It was here pointed out that when the Board in that case sought to hold that the union's economically harassing tactics, a sort of sit-down, slow-down, were unlawful it was "functioning as an arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands. It has sought to introduce some standard of properly 'balanced' bargaining power, or some new distinction of justifiable and unjustifiable, proper and 'abusive' economic weapons into the collective bargaining duty imposed by the Act." (361 U.S. at page 497, 80 S.Ct. at page 431.)

In recognizing the propriety of the lockout, the Court in National Labor Relations Board v. Truck Drivers Union, supra, 353 U.S. at page 93, 77 S.Ct. at page 646, noted that the employers were permitted to resort to it "as an economic weapon." By that economic weapon the employers undertook to see that the union members who were proposing to pick them off one at a time by the "whipsaw" tactics were denied the opportunity to collect wages while they were doing this. Here, when the Board undertook to say that this economic weapon could not be made fully effective in the manner the respondents undertook to do, the Board

was "picking and choosing which economic devices of labor and management shall be branded as unlawful." As the Court said of the Insurance Agents Union, "the activities here involved have never been specifically outlawed by Congress." (361 U.S. at page 498, 80 S.Ct. at page 431.) The Board here was moving "into a new area of regulation which Congress had not committed to it." (361 U.S. at page 499, 80 S.Ct. at page 433.) It was none of the business of the Board "to define through its processes what economic sanctions might be permitted negotiating parties in an 'ideal' or 'balanced' state of collective bargaining." (361 U.S. at page 500, 80 S.Ct. at page 433.)

Enforcement is denied.