**CAROLINE FARMS DIVISION OF TEXTRON, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 12011.**

United States Court of Appeals Fourth Circuit.

Argued May 7, 1968.

Decided Sept. 13, 1968.

William W. Sturges, Charlotte, N. C., (Weinstein, Waggoner, Sturges & Odom, Charlotte, N. C., on brief) for petitioner.

Robert E. Williams, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Paul J. Spielberg, Attys., N.L.R.B., on brief) for respondent.

Before BRYAN, CRAVEN, and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

These petitions raise the question of whether substantial evidence on the record as a whole supports the National Labor Relations Board's finding that Caroline Farms violated §§ 8(a) (5) and (1) of the Act[1] by refusing to bargain in good faith with a union[2] that had been certified as a representative of its employees at its feed mill. The Board rested its decision[3] on the totality of the company's conduct following a strike in September 1965. It found the company's rejection of provisions of the bargaining agreement to which it had agreed before the strike, when considered with other conduct, evidenced a determination to go through the motions of collective bargaining without a bona fide intention to reach an agreement. The Board emphasized: (1) the company's avoidance of bargaining sessions between September 22 and December 6; (2) the company's abrogation on December 20 of its agreement of December 6 to provide the union with a written proposal; and (3) the company's refusal to consider granting any form of union security and its insistence upon a no-strike clause while rejecting any form of binding arbitration, although before the strike it had reached agreement with the union on these issues.

We agree with the Board that the charges against the company must be viewed in the context of its total conduct, NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 134 (1st Cir. 1953), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953), but we find, after considering the record as a whole, that the Board's order is not supported by substantial evidence.

I.

Caroline operates an integrated poultry business, including a hatchery, feed mill, and processing plants on the Delmarva peninsula. After a representational election conducted among the employees at the feed mill, the union was certified in May 1965 as the exclusive bargaining representative of the employees. In August, after four routine bargaining sessions in which both sides made concessions, the company and the union reached an agreement. Aside from wage rates, shift differentials, and other matters of a local nature, the contract was based on the industry's Master Poultry Agreement, which was in effect at the company's processing plants. The master agreement contained a provision for compulsory arbitration of grievances, a no-strike clause, and a union security clause with dues checkoff. Although

---

1. 29 U.S.C. § 158(a). "It shall be an unfair labor practice for an employer—
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *
 "(5) to refuse to bargain collectively with the representatives of his employees * * *."

2. Chauffeurs, Warehousemen and Helpers Local Union No. 876, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

3. Caroline Farms Division of Textron, Inc., 163 NLRB No. 100, 64 LRRM 1465 (1967).

the union recommended acceptance of the contract, the employees rejected it because of its wage provisions.

On September 11, union and company negotiators again met, and the company offered a new wage proposal, which the union rejected. The union submitted a counter proposal and announced that if the company did not respond to this by the following Monday, September 13, a picket line would be established on Tuesday morning. The company replied that it could not give its answer until Wednesday, September 15, because its top management was out of town. On Tuesday, September 14, the union struck the company's mill, and the next day the company stated that the union's proposal was not acceptable.

On September 22, a union representative called the company's industrial relations director for an immediate meeting. They met that evening, and after the union was unable to secure improvements in the company's last wage offer, it agreed to accept the offer as a basis for settling the strike. It was also agreed that a holiday would count as overtime except when the holiday fell on Saturday. These were the only agreements reached at the meeting. The parties recognized that other issues would have to be negotiated, but they now differ about who were to be the negotiators. The union contends the matter was left to lawyers representing the company and the union, who were expected to follow the Master Poultry Agreement. The company contends that it made clear its position that all proposals would have to be worked out through its director of industrial relations.

Although the contract was not completed, the strike ended on September 23, and the employees returned to work at the wage rate agreed upon at the meeting the day before. On several occasions thereafter the attorney for the union called the attorney for the company in unsuccessful efforts to arrange a meeting to complete the contract. The union's attorney testified that the company's attorney said that he had been unable to contact the company and that he suspected he "might be getting ducked by his client."

On October 18, the union filed a charge with the Board alleging that the company had refused to bargain. On November 18, 1965, the union's attorney wrote the company's director of industrial relations asserting that it was the union's understanding that the wage items having been settled, the attorneys for the parties were to draft a contract along the lines of the Master Poultry Agreement. The company replied on November 24 that the union's position was not accurate, that the company had made it clear at the conclusion of the September 22 session that all items not agreed to at that time remained open for negotiation.[4] After this exchange of correspondence, a bargaining session was arranged for December 6.

To establish that the lapse of bargaining between September 22 and December 6 showed bad faith, the Board relied primarily upon the hearsay testimony that the company was avoiding its own attorney to delay bargaining. This testimony was contradicted. The company's director of industrial relations denied that the company avoided its attorney. He testified that two days after the strike was settled he talked with the attorney and also that he returned a call from the attorney received before the unfair labor charge was filed in October, only to find the attorney out of town. In any event, when union dissatisfaction with the course of the bargaining was made known to the company, it discharged its attorney and arranged bargaining sessions. On no other occasion has it been suggested that the company unjustifiably delayed meetings or refused to attend bargaining sessions. On the

---

4. The complaint alleged, and the trial examiner found, that the company's refusal to bargain originated with its letter of November 24. The Board found instead that the company's refusal stemmed from its conduct beginning on September 22.

contrary, the record discloses the company promptly scheduled all other sessions. The absence of bargaining between September 22 and December 6, when viewed in the context of the full record, does not demonstrate bad faith, either by itself, or in connection with other evidence.

## II.

At the December 6 session, although the parties readily agreed upon some relatively unimportant provisions, they failed to reach agreement on more substantial items after several hours of discussion. Just before the session adjourned the union's attorney suggested that the company submit a complete agreement by mail before Christmas. This was intended to give the union an opportunity to study the company's proposals before the next bargaining session, which was scheduled for early January. The company agreed to the union's suggestion. However, on December 20, the company wrote the union that althouh operational clauses pertaining to hours of work, vacations, holidays, grievances, and seniority had been prepared, these proposals did not "lend themselves to negotiation by mail" and should be discussed at the next bargaining session. When the next session began on January 4, 1966, the company distributed thirteen contract provisions. .Some of these were accepted by the union, and to others the union made counterproposals which the company accepted. Upon the remainder, the parties could not reach agreement, and they were held for further consideration.

 We cannot agree with the Board that the company's refusal to comply with its agreement to submit its proposals to the union by mail evidenced a lack of good faith bargaining. While an employer's repudiation of an arrangement concerning bargaining procedures may evidence bad faith in some instances, it falls short of doing so here. The procedure the company suggested did not cause any material delay. The selection of January 4 for the next meeting was consistent with the schedule the parties had made early in December. A number of the proposals were unacceptable to the union, so even if they had been submitted by mail, further negotiations would have been necessary. More importantly, the Board gave no consideration to the fact that the union was satisfied with the procedure suggested by the company. On January 14, 1966, the union wrote the Board's regional director advising that the company was meeting with the union and that progress apparently was being made toward "the consummation of a collective bargaining agreement." For that reason the union withdrew the charge filed the previous October.

## III.

The company's refusal to bargain culminated, according to the Board, in the final bargaining sessions on January 19 and February 9. It was then that the company expressed its opposition to union security and compulsory arbitration.

At the January 19 bargaining session the parties were first unable to reach agreement on hours of work. An agreement, however, was reached with respect to vacation, but in the meantime the union had changed its position with regard to holiday pay. After protesting the absence of an arbitration clause, the union suggested that it would accept a grievance procedure without arbitration, if the company would give up the no-strike clause. The company stated that it would consider this proposal, and the parties moved on to other matters. After reaching substantial agreement on seniority, the parties agreed to meet in February.

The final bargaining session began on the morning of February 9, 1966. The parties had previously agreed that they would go through the evening, if necessary, to arrive at a complete settlement. At the start of the meeting, however, the union representatives stated that they would not be able to continue the meeting in the evening because they

had other appointments. The parties first discussed the ·hours of work and reached no final agreement. The company then proposed a new grievance procedure, which included permissive arbitration. The union was willing to accept this, if as an exception to the no-strike clause, the union retained the right to strike when the company refused to arbitrate. The company was willing to take this counterproposal under consideration. After reaching agreement on several other matters, the parties proceeded to a discussion of seniority. The company's seniority proposal was agreeable to the union, subject to union security. But the company stated that it would not grant a union security clause or an agency shop. The union replied that it would refuse to sign a contract without either one or the other of these clauses. Then although a company representative suggested that the parties continue their negotiations on the rest of the contract, the president of the local said there was no sense in talking about anything else. The session came to an abrupt end.

The Board found evidence of the company's lack of good faith bargaining in "its insistence upon a no-strike clause while rejecting any form of binding arbitration." [5] The difficulty with this conclusion lies with the Board's appraisal of uncontradicted facts. Although the company at one time proposed a no-strike clause without an arbitration clause, it was willing to consider the union's counterproposal. No witness doubted that the company had the counterproposal under genuine consideration when the bargaining ended. Furthermore, a company witness testified

without contradiction that the union's attorney observed that the parties were close to settlement except for union security. This is consistent with the fact that the union's charge filed in February 1966 contained no criticism of the company's position regarding arbitration or the right to strike.

■■■ The Board also held that the company's refusal to consider granting any form of union security furnished additional evidence of lack of good faith bargaining. Union security, including dues checkoff, is a mandatory subject of bargaining under § 8(a) (5) and § 8 (d). United Steelworkers v. NLRB, 390 F.2d 846, 849 (D.C.Cir.), cert. denied, Roanoke Iron & Bridge Works, Inc. v. NLRB, 391 U.S. 904, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968). An employers refusal to negotiate in fact—to meet and confer—on this issue violates the Act even without a general failure of subjective good faith. See NLRB v. Katz, 369 U.S. 736, 742, 82 S.Ct. 1107, 8 L.Ed. 2d 230 (1962). It is quite clear, however, that the company did not refuse to negotiate in fact. The company had negotiated a contract with a union security clause acceptable to the union officials. After the contract was rejected by the employees, the company again negotiated to the point where the parties admittedly were close to agreement. When the company made known its opposition to the union's insistence upon a union security clause, it was the union that abruptly broke off negotiations. Indeed, just before the final session terminated, the company asked whether the rest of the contract would be acceptable if the union got union security. The union representative gave an equivocal reply.[6]

---

5. Caroline Farms Division of Textron, Inc., 163 NLRB No. 100, 64 LRRM 1465, 1466 (1967).

6. Mr. James E. O'Connell, a company representative, testified: "Mr. Reynolds [a union representative] made the statement that he would refuse to sign any contract without a union security clause or an agency shop. He stated, we will do what we have to, to bring it to a

head. We have ways of bringing it about. The meeting is at an end.

"I asked, how about talking about the rest of the contract, and Mr. Reynolds said, there's no sense in talking about anything else. Mr. Abato [a union representative] said, we're so close to a settlement, but it all hinges on union security. I asked Mr. Abato, do you mean that the rest of the contract is okay as we presented it, if you get union security?

Of course, if an employer does negotiate in fact, as the company did here, its adamant position may be merely hard bargaining, which is not a violation of the Act, or it may evidence a purpose to frustrate a bargaining agreement. United Steelworkers v. NLRB, 124 U.S.App.D.C. 143, 363 F.2d 272 cert. denied, H. K. Porter, Inc. v. NLRB, 385 U.S. 851, 87 S.Ct. 90, 17 L.Ed.2d 80 (1966). Whether the employer acts in good faith depends upon its state of mind. Often this can be determined only by inferences reasonably drawn from circumstantial evidence. See NLRB v. Mrs. Fay's Pies, 341 F.2d 489 (9th Cir. 1965). Here the evidence clearly shows that the company's hard position on union security was not taken with the purpose of frustrating collective bargaining.

Finally, the company's change of position on union security and binding arbitration after the strike, standing alone, does not evidence a failure to bargain in good faith.[7] A number of cases recognize the right of the employer to withdraw concessions granted before a strike. E. g., Midwestern Instruments, Inc., 133 NLRB 1132, 48 LRRM 1793 (1961); Great Falls Employers' Council, Inc., 123 NLRB 974, 44 LRRM 1021 (1959), rev'd on other grounds, 277 F.2d 772 (9th Cir. 1960); cf. NLRB v. Hart Cotton Mills, 190 F.2d 964, 969 (4th Cir. 1951). In any event, we do not understand the Board to contend that an employer's change of position after a strike is a per se violation of the duty to bargain.

The petition to set aside the Board's order is granted. The cross-petition to enforce the order is denied.

---

Mr. Abato replied, well, I didn't say exactly that, but the principles you are talking about are agreeable, if we get union security, just some minor changes in wording. We don't intend to sign a three-year contract when there will be nobody paying dues in six months, and we are servicing them for no money."

7. The company sought to justify its change of position on the ground that employees who worked during the strike did not wish to be compelled to join the union. On the other hand, the union attributed the change to the company's adherence to "principle." Both sides claimed support for their version in conflicting testimony concerning the discussion at the last bargaining session. The trial examiner expressly declined to make credibility findings with respect to this testimony. When the company's conduct is considered in its totality, we believe the case does not turn upon a resolution of this conflicting evidence.